# LEISY v. HARDIN.

## ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 1459.　Submitted January 6, 1890.—Decided April 28, 1890.

A statute of a State, prohibiting the sale of any intoxicating liquors, except for pharmaceutical, medicinal, chemical or sacramental purposes, and under a license from a county court of the State, is, as applied to a sale by the importer, and in the original packages or kegs, unbroken and unopened, of such liquors manufactured in and brought from another State, unconstitutional and void, as repugnant to the clause of the Constitution granting to Congress the power to regulate commerce with foreign nations and among the several States.

*Peirce* v. *New Hampshire*, 5 How. 504, overruled.

MR. CHIEF JUSTICE FULLER, on behalf of the court, stated the case as follows:

Christine Leisy, Edward Leisy, Lena and Albert Leisy, composing the firm of Gus. Leisy & Co., citizens of Illinois, brought their action of replevin against A. J. Hardin, the duly elected and qualified marshal of the city of Keokuk, Iowa, and *ex officio* constable of Jackson township, Lee County, Iowa, in the Superior Court of Keokuk, in said county, to recover 122 one-quarter barrels of beer, 171 one-eighth barrels of beer, and 11 sealed cases of beer, which had been seized by him in a proceeding on behalf of the State of Iowa against said defendants, under certain provisions of the code of the State of Iowa; and upon issue joined, a jury having been duly waived by the parties, the case was submitted to the court for trial, and, having been tried, the court, after having taken the case under advisement, finally "rendered and filed in said cause its findings of fact and conclusions of law in words and figures following, to wit:

" 1st. That plaintiffs, Gus. Leisy & Co., are a firm of that name and style, residing in the State of Illinois, with principal place of business at Peoria, Illinois; that said firm is composed wholly of citizens of Illinois; that said firm is engaged as

brewers in the manufacture of beer in the said city of Peoria, Illinois, selling same in the States of Illinois and Iowa.

"2d. That the property in question, to wit, 122 one-quarter barrels of beer, of the value of $300, 171 one-eighth barrels of beer, value $215, and 11 sealed cases of beer, value of $25, was all manufactured by said Leisy & Co. in the city of Peoria, Illinois, and put up in said kegs and cases by the manufacturers, viz., Gus. Leisy & Co., at Peoria, Illinois; that each of said kegs was sealed and had placed upon it, over the plug in the opening of each keg, a United States internal revenue stamp of the district in which Peoria is situated; that said cases were substantially made of wood, each one of them containing 24 quart bottles of beer, each bottle of beer corked and the cork fastened in with a metallic cap, sealed and covered with tin-foil, and each case was sealed with a metallic seal; that said beer in all of said kegs and cases was manufactured and put up into said kegs and cases as aforesaid by the manufacturers, to wit, Gus. Leisy & Co., plaintiffs in this suit, and to open said cases the metallic seals had to be broken.

"3d. That the property herein described was transported by said Gus. Leisy & Co. from Peoria, Illinois, by means of railways to Keokuk, Iowa, in said sealed kegs and cases, as same was manufactured and put up by them in the city of Peoria, Illinois.

"4th. That said property was sold and offered for sale in Keokuk, Iowa, by John Leisy, a resident of Keokuk, Iowa, who is agent for said Gus. Leisy & Co.; that the only sales and offers to sell of said beer was in the original keg and sealed case as manufactured and put up by said Gus. Leisy & Co. and imported by them into the State of Iowa; that no kegs or cases sold or offered for sale were broken or opened on the premises; that as soon as same was purchased it was removed from the premises occupied by Gus. Leisy & Co., which said premises are owned by Christiana Leisy, a member of the firm of Gus. Leisy & Co., residing in and being a citizen of Peoria, Illinois; that none of such sales or offers to sell were made to minors or persons in the habit of becoming intoxicated.

"5th. That on the 30th day of June, 1888, the defendant, as

constable of Jackson township, Lee County, Iowa, by virtue of a search warrant issued by J. G. Garrettson, an acting justice of the peace of said Jackson township, upon an information filed charging that in premises occupied by said John Leisy there were certain intoxicating liquors, etc., seized the property therein described and took same into his custody.

"6th. And the court finds that said intoxicating liquors thus seized by the defendant in his official capacity as constable were kept for sale in the premises described in the search warrant in Keokuk, Lee County, Iowa, and occupied by Gus. Leisy & Co. for the purpose of being sold, in violation of the provisions of the laws of Iowa, but which laws, the court holds, are unconstitutional and void, as herein stated.

"7th. That on the 2d day of July, 1888, plaintiffs filed in this court their petition, alleging, among other things, that they were the owners and entitled to the possession of said property, and that the law under which said warrant was issued was unconstitutional and void, being in violation of section 8 of article I of the Constitution of the United States, and having filed a proper bond, a writ of replevin issued and the possession of said property was given to plaintiffs.

"From the foregoing facts the court finds the following conclusions:

"That plaintiffs are the sole and unqualified owners of said property and entitled to the possession of same and judgment for one dollar damages for their detention and costs of suit; that so much of chapter 6, title XI, of the Code of 1873, and the amendments thereto, as prohibits such sales by plaintiffs as were made by plaintiffs, is unconstitutional, being in contravention of section 8 of article I of the Constitution of the United States; that said law has been held unconstitutional in a like case heretofore tried and determined by this court, involving the same question, in the case of *Collins* v. *Hills*, decided prior to the commencement of this suit and prior to the seizure of said property by defendant; to all of which the defendant at the time excepted."

Judgment was thereupon rendered as follows:

"This cause coming on for hearing, plaintiffs appearing by

Anderson & Davis, their attorneys, and the defendant by H. Scott Howell & Son and Wm. B. Collins, his attorneys, and the cause coming on for final hearing on the pleadings on file and the evidence introduced, the court makes the special finding of facts and law herewith ordered to be made of record and finds that plaintiffs are the sole and unqualified owners and entitled to possession of the following-described personal property, to wit: 122 one-quarter ($\frac{1}{4}$) barrels of beer of the value of $300; 171 one-eighth ($\frac{1}{8}$) barrels of beer of the value of $215, and 11 sealed cases of beer of the value of $25.

"That, plaintiffs being in possession of said property by virtue of a bond heretofore given, said possession in plaintiffs is confirmed. The court further finds that the writ issued by J. G. Garrettson, a justice of the peace, under which defendant held possession of said property and seized same, is void, same having been issued under sections of the law of Iowa that are unconstitutional and void.

"That plaintiff is entitled to one dollar damages for the wrongful detention of said property.

"It is therefore ordered and considered by the court that the plaintiffs have and recover of defendant the sum of one dollar damages, and costs of this action, taxed at $ —

"To which findings, order and judgment of court the defendant at the time excepts and asks until the 31st day of October, 1888, to prepare and file his bill of exceptions, which request is granted and order hereby made."

A motion for new trial was made and overruled, and the cause taken to the Supreme Court of Iowa by appeal, and errors therein assigned as follows:

"I. The court erred in finding that the plaintiffs were the sole and unqualified owners and were entitled to the possession of the intoxicating liquors seized and held by appellant.

"II. In finding that the plaintiffs were entitled to one dollar damages for their detention, and for costs of suit.

"III. The court erred in holding that the sales of beer in 'original packages,' by the keg and case, as made by John Leisy, agent of plaintiffs, were lawful.

"IV. The court erred in its conclusions and finding that so

much of the law of the State of Iowa embraced in chapter 6, title XI, Code of 1873, and the amendments thereto, as prohibits such sales of beer in the State of Iowa was unconstitutional, being in contravention of section 8, article I, of the Constitution of the United States.

" V. The court erred in rendering a judgment for plaintiffs and awarding them the intoxicating liquors in question and damages and costs against defendant.

" VI. The court erred in overruling the defendant's motion for a new trial."

The Supreme Court reversed the judgment of the Superior Court, and entered judgment against the plaintiffs and their sureties on the replevin bond in the amount of the value of the property, with costs. The judgment thus concluded: " And it is further certified by this court, and hereby made a part of the record, that in the decision of this suit there is drawn in question the validity of certain statutes of the State of Iowa, namely, chap. 6 of title XI of the Code of Iowa of 1873 and the amendments thereto, on the ground of their being repugnant to and in contravention of section 8 of article I of the Constitution of the United States, said appellees, Gus. Leisy & Co., claiming such statutes of the State of Iowa are invalid, and the decision in this cause is in favor of the validity of said statutes of the State of Iowa."

To review this judgment, a writ of error was sued out from this court.

The opinion of the Supreme Court, not yet reported in the official series, will be found in 43 N. W. Rep. 188.

The seizure of the beer in question by the constable was made under the provisions of chapter 6, title XI, of the Code of 1873 and amendments thereto. (Code 1873, p. 279; Laws 1884, c. 8, p. 8, c. 143, p. 146; Laws 1888, c. 71, p. 91; 1 McClain's Ann. Code, §§ 2359 to 2431, p. 603.)

Section 1523 of the Code is as follows:

" No person shall manufacture or sell, by himself, his clerk, steward or agent, directly or indirectly, any intoxicating liquors except as hereinafter provided. And the keeping of intoxicating liquor, with the intent on the part of the owner thereof,

or any person acting under his authority, or by his permission, to sell the same within this state contrary to the provisions of this chapter, is hereby prohibited, and the intoxicating liquor so kept, together with the vessels in which it is contained, is declared a nuisance, and shall be forfeited and dealt with as hereinafter provided."

Chapter 71 of the Laws of the 22d General Assembly is an act approved April 12, 1888 (Laws Iowa, 1888, p. 91), of which the first section is as follows:

"That after this act takes effect no person shall manufacture for sale, sell, keep for sale, give away, exchange, barter or dispense any intoxicating liquor, for any purpose whatever, otherwise than as provided in this act. Persons holding permits as herein provided shall be authorized to sell and dispense intoxicating liquors for pharmaceutical and medicinal purposes and alcohol for specified chemical purposes, and wine for sacramental purposes, but for no other purposes whatever; and all permits must be procured as hereinafter provided from the district court of the proper county at any term thereof after this act takes effect, and a permit to buy and sell intoxicating liquors when so procured shall continue in force for one year from date of its issue unless revoked according to law or until application for renewal is disposed of, if such application is made before the year expires. Provided, tha' renewals of permits may be annually granted upon written application by permit holders who show to the satisfaction of the court or judge that they have during the preceding year complied with the provisions of this act and execute a new bond as in this act required to be originally given, but parties may appear and resist renewals the same as in applications for permits."

Section 2 provides for notice of application for permit, and section 3 reads thus:

"Applications for permits shall be made by petition signed and sworn to by the applicant and filed in the office of the clerk of the district court of the proper county at least ten days before the first day of the term, which petition shall state the applicant's name; place of residence; in what business he is then engaged, and in what business he has been engaged for

two years previous to filing petition; the place, particularly describing it, where the business of buying and selling liquor is to be conducted; that he is a citizen of the United States and of the State of Iowa; that he is a registered pharmacist and now is, and for the last six months has been lawfully conducting a pharmacy in the township or town wherein he proposes to sell intoxicating liquors under the permit applied for, and as the proprietor of such pharmacy, that he has not been adjudged guilty of violating the law relating to intoxicating liquors within the last two years next preceding his application; and is not the keeper of a hotel, eating-house, saloon, restaurant or place of public amusement; that he is not addicted to the use of intoxicating liquors as a beverage, and has not within the last two years next preceding his application been directly or indirectly engaged, employed or interested in the unlawful manufacture, sale or keeping for sale of intoxicating liquors; and that he desires a permit to purchase, keep and sell such liquors for lawful purposes only."

Various sections follow, relating to giving bond; petition as to the good moral character of applicant; hearing on the application; oath upon the issuing of permit; keeping of record; punishment by fine, imprisonment, etc.

By section 20, sections 1524, 1526, and other sections of the Code were, in terms, repealed.

The Code provided for the seizure of intoxicating liquors unlawfully offered for sale, and no question in reference to that arises here, if the law in controversy be valid.

By section 1 of chapter 8 of the Laws of 1884, p. 8, ale, beer, wine, spirituous, vinous and malt liquors are defined to be intoxicating liquors.

Section 1524 of the Code of 1873, p. 279, was as follows:

"Nothing in this chapter shall be construed to forbid the sale, by the importer thereof, of foreign intoxicating liquor imported under the authority of the laws of the United States regarding the importation of such liquors and in accordance with such laws: *Provided*, That the said liquor, at the time of said sale by said importer, remains in the original casks or packages in which it was by him imported, and in quantities

not less than the quantities in which the laws of the United States require such liquors to be imported, and is sold by him in said original casks or packages and in said quantities only; and nothing contained in this law shall prevent any persons from manufacturing in this State liquors for the purpose of being sold according to the provisions of this chapter, to be used for mechanical, medicinal, culinary or sacramental purposes."

This section is substantially identical with section 2 of chapter 45 of the acts of the fifth general assembly of Iowa, approved January 22, 1855 (Laws Iowa, 1854–1855, p. 58); and it was carried into the revision of 1860 as section 1560 (Revision 1860, Chap. 64, p. 259). It was repealed by section 20 of the act of April 12, 1888, as before stated.

Section 1553 of the Code, as amended by the act of April 5, 1886 (Laws Iowa, 1886, p. 83, c. 66, § 10), forbade any common carrier to bring within the State of Iowa, for any person or persons, or corporation, any intoxicating liquors from any other State or Territory of the United States, without first having been furnished with a certificate, under the seal of the county auditor of the county to which said liquor was to be transported, or was consigned for transportation, certifying that the consignee, or person to whom such liquor was to be transported, conveyed or delivered, was authorized to sell intoxicating liquors in such county. This was held to be in contravention of the federal constitution, in *Bowman v. Chicago & North Western Railway Co.*, 125 U. S. 465.

*Mr. James C. Davis* for plaintiffs in error.

*Mr. H. Scott Howell* and *Mr. W. B. Collins* for defendant in error.

*Mr. John Y. Stone*, Attorney General for the State of Iowa, for that State.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The power vested in Congress " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," is the power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution. It is co-extensive with the subject on which it acts and cannot be stopped at the external boundary of a State, but must enter its interior and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered. *Gibbons* v. *Ogden*, 9 Wheat. 1; *Brown* v. *Maryland*, 12 Wheat. 419.

And while, by virtue of its jurisdiction over persons and property within its limits, a State may provide for the security of the lives, limbs, health and comfort of persons and the protection of property so situated, yet a subject matter which has been confided exclusively to Congress by the Constitution is not within the jurisdiction of the police power of the State, unless placed there by congressional action. *Henderson* v. *Mayor of New York*, 92 U. S. 259; *Railroad Co.* v. *Husen*, 95 U. S. 465; *Walling* v. *Michigan*, 116 U. S. 466; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489. The power to regulate commerce among the States is a unit, but if particular subjects within its operation do not require the application of a general or uniform system, the States may legislate in regard to them with a view to local needs and circumstances, until Congress otherwise directs; but the power thus exercised by the States is not identical in its extent with the power to regulate commerce among the States. The power to pass laws in respect to internal commerce, inspection laws, quarantine laws, health laws and laws in relation to bridges, ferries and highways, belongs to the class of powers pertaining to locality, essential to local intercommunication, to the progress and development of local prosperity and to the protection, the safety and the welfare of society, originally necessarily belonging to, and upon the adoption of the Constitution reserved by, the States, except so far as falling within the scope of a power confided to the general government. Where the sub-

ject matter requires a uniform system as between the States, the power controlling it is vested exclusively in Congress, and cannot be encroached upon by the States; but where, in relation to the subject matter, different rules may be suitable for different localities, the States may exercise powers which, though they may be said to partake of the nature of the power granted to the general government, are strictly not such, but are simply local powers, which have full operation until or unless circumscribed by the action of Congress in effectuation of the general power. *Cooley* v. *Port Wardens of Philadelphia*, 12 How. 299.

It was stated in the 32d number of the Federalist that the States might exercise concurrent and independent power in all cases but three: First, where the power was lodged exclusively in the federal constitution; second, where it was given to the United States and prohibited to the States; third, where, from the nature and subjects of the power, it must be necessarily exercised by the national government exclusively. But it is easy to see that Congress may assert an authority under one of the granted powers, which would exclude the exercise by the States upon the same subject of a different but similar power, between which and that possessed by the general government no inherent repugnancy existed.

Whenever, however, a particular power of the general government is one which must necessarily be exercised by it, and Congress remains silent, this is not only not a concession that the powers reserved by the States may be exerted as if the specific power had not been elsewhere reposed, but, on the contrary, the only legitimate conclusion is that the general government intended that power should not be affirmatively exercised, and the action of the States cannot be permitted to effect that which would be incompatible with such intention. Hence, inasmuch as interstate commerce, consisting in the transportation, purchase, sale and exchange of commodities, is national in its character, and must be governed by a uniform system, so long as Congress does not pass any law to regulate it, or allowing the States so to do, it thereby indicates its will

that such commerce shall be free and untrammelled. *County of Mobile* v. *Kimball*, 102 U. S. 691; *Brown* v. *Houston*, 114 U. S. 622, 631; *Wabash, St. Louis &c. Railway* v. *Illinois*, 118 U. S. 557; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 493.

That ardent spirits, distilled liquors, ale and beer are subjects of exchange, barter and traffic, like any other commodity in which a right of traffic exists, and are so recognized by the usages of the commercial world, the laws of Congress and the decisions of courts, is not denied. Being thus articles of commerce, can a State, in the absence of legislation on the part of Congress, prohibit their importation from abroad or from a sister State? or when imported prohibit their sale by the importer? If the importation cannot be prohibited without the consent of Congress, when does property imported from abroad, or from a sister State, so become part of the common mass of property within State as to be subject to its unimpeded control?

In *Brown* v. *Maryland* (*supra*) the act of the state legislature drawn in question was held invalid as repugnant to the prohibition of the Constitution upon the States to lay any impost or duty upon imports or exports, and to the clause granting the power to regulate commerce; and it was laid down by the great magistrate who presided over this court for more than a third of a century, that the point of time when the prohibition ceases and the power of the State to tax commences, is not the instant when the article enters the country, but when the importer has so acted upon it that it has become incorporated and mixed up with the mass of property in the country, which happens when the original package is no longer such in his hands; that the distinction is obvious between a tax which intercepts the import as an import on its way to become incorporated with the general mass of property, and a tax which finds the article already incorporated with that mass by the act of the importer; that as to the power to regulate commerce, none of the evils which proceeded from the feebleness of the federal government contributed more to the great revolution which introduced the present system, than

the deep and general conviction that commerce ought ·to be regulated by Congress ; that the grant should· be as extensive as the mischief, and should comprehend all foreign commerce and all commerce among the States ; that that power was complete in itself, acknowledged no limitations other than those prescribed by the Constitution, was co-extensive with the subject on which it acts and not to be stopped at the ·external boundary of a State, but must be capable of entering its interior.; that the right to sell any article imported was an inseparable incident to the right to import it; and that the principles expounded in the case applied equally to importations from a sister State. Manifestly this must be so, for the same public policy applied to commerce among the States as to foreign commerce, and not a reason could ·be assigned for confiding the power over the one which did not conduce to establish the propriety of confiding the power over the other. ˙ Story, Constitution, § 1066. And although the precise question before· us was not ruled in *Gibbons* v.˙ *Ogden* and *Brown* v. *Maryland,* yet we think it was virtually involved and answered, and that this is demonstrated, among other cases, in *Bowman* v. *Chicago & Northwestern Railway Co.,* 125 U. S. 465. In the latter case, section 1553 of the Code of the State of Iowa as amended by c. 143 of the acts of the twentieth General Assembly in 1886, forbidding common carriers to bring· intoxicating liquors into the· State from any other State or. Territory, without· first being furnished with a certificate as prescribed, was declared invalid, because essentially a regulation of commerce among the States, and not sanctioned by the authority, express or implied, of Congress. The opinion of the court, delivered by Mr. Justice Matthews, the concurring opinion of Mr. Justice Field, and the dissenting opinion by Mr. Justice Harlan, on behalf of Mr. Chief Justice Waite, Mr. Justice Gray, · and himself, discussed the question involved in all its phases; and while the determination of whether the right of transportation of an article of commerce from one State to another includes by necessary implication the right of the consignee to sell it in unbroken packages at the place where the transportation terminates was in terms reserved, yet the argument of the majority

conducts irresistibly to that conclusion, and we think we cannot do better than repeat the grounds upon which the decision was made to rest. It is there shown that the transportation of freight or of the subjects of commerce, for the purpose of exchange or sale, is beyond all question a constituent of commerce itself; that this was the prominent idea in the minds of the framers of the Constitution, when to Congress was committed the power to regulate commerce among the several States; that the power to prevent embarrassing restrictions by any State was the end desired; that the power was given by the same words and in the same clause by which was conferred power to regulate commerce, with foreign nations; and that it would be absurd to suppose that the transmission of the subjects of trade from the State of the buyer, or from the place of production to the market, was not contemplated, for without that there could be no consummated trade, either with foreign nations or among the States. It is explained that where State laws alleged to be regulations of commerce among the States have been sustained, they were laws which related to bridges or dams across streams, wholly within the State, or police or health laws, or to subjects of a kindred nature, not strictly of commercial regulation. But the transportation of passengers or of merchandise from one State to another is in its nature national, admitting of but one regulating power; and it was to guard against the possibility of commercial embarrassments which would result if one State could directly or indirectly tax persons or property passing through it, or prohibit particular property from entrance into the State, that the power of regulating commerce among the States was conferred upon the federal government.

"If in the present case," said Mr. Justice Matthews, "the law of Iowa operated upon all merchandise sought to be brought from another State into its limits, there could be no doubt that it would be a regulation of commerce among the States," and he concludes that this must be so, though it applied only to one class of articles of a particular kind. The legislation of Congress on the subject of interstate commerce by means of railroads, designed to remove trammels

upon. transportation between .different States, and ·upon the subject 'of the transportation of passengers and merchandise, (Revised Statutes, sections 4252 to 4289, inclusive,) including the transportation of nitro-glycerine and other similar explosive substances, with the proviso that, as to them, "any State, territory, district, city or town within the United States" should not be prevented by the language used "from regulat-- ing or from. prohibiting the traffic in or transportation of those substances between persons or places lying or being within their respective territorial limits, or from prohibiting the intro- duction thereof into such limits for sale, use or consumption therein," is referred to as indicative of the intention of Con- gress that the transportation of commodities between the States shall be free, except where it is positively restricted by Congress itself, or by States in particular cases by the express permission of Congress. It is said that the law in question was not an inspection law, the object of which "is to improve the quality of articles produced by the labor of a country, to fit them for exportation; or, it may be, for domestic use;" *Gibbons* v. *Ogden*, 9 Wheat. 1, 203; *Turner* v. *Maryland*, 107 U. S. 38, 55.; nor could it be regarded as a regulation of quar- antine or a sanitary provision for the purpose of protecting the physical health of the community; nor a law to prevent the introduction into the State of diseases, contagious, infec- tious, or otherwise. Articles in such a condition as tend to spread disease are not merchantable, are not legitimate sub- jects of trade and commerce, and the self-protecting power of each State, therefore, may be rightfully exerted against their introduction, and such exercise of power cannot be considered a regulation of commerce, prohibited by the Constitution; and the observations of Mr. Justice Catron, in *The License Cases*, 5 How. 504, 599, are quoted to the effect that what does not belong to commerce is within the jurisdiction of the police power of the State, but that which does belong to com-. merce is within the jurisdiction of the United States; that to extend the police power over subjects of commerce would be to make commerce subordinate to that power, and would enable the State to bring within the police power "any article,

of consumption that a State might wish to exclude, whether it belonged to that which was drunk, or to food and clothing; and with nearly equal claims to propriety, as malt liquors and the products of fruits other than grapes stand on no higher ground than the light wines of this and other countries, excluded in effect by the law as it now stands. And it would be only another step to regulate real or supposed extravagance in food and clothing." And Mr. Justice Matthews thus proceeds, p. 493: "For the purpose of protecting its people against the evils of intemperance, it has the right to prohibit the manufacture within its limits of intoxicating liquors; it may also prohibit all domestic commerce in them between its own inhabitants, whether the articles are introduced from other States or from foreign countries; it may punish those who sell them in violation of its laws; it may adopt any measures tending, even indirectly and remotely, to make the policy effective until it passes the line of power delegated to Congress under the Constitution. It cannot, without the consent of Congress, express or implied, regulate commerce between its people and those of the other States of the Union in order to effect its end, however desirable such a regulation might be. . . . Can it be supposed that by omitting any express declaration on the subject, Congress has intended to submit to the several States the decision of the question in each locality of what shall and what shall not be articles of traffic in the interstate commerce of the country? If so, it has left to each State, according to its own caprice and arbitrary will, to discriminate for or against every article grown, produced, manufactured or sold in any State and sought to be introduced as an article of commerce into any other. If the State of Iowa may prohibit the importation of intoxicating liquors from all other States, it may also include tobacco, or any other article, the use or abuse of which it may deem deleterious. It may not choose, even, to be governed by considerations growing out of the health, comfort or peace of the community. Its policy may be directed to other ends. It may choose to establish a system directed to the promotion and benefit of its own agriculture, manufactures or arts of any

description, and prevent the introduction and sale within its limits of any or of all articles that it may select as coming into competition with those which it seeks to protect. The police power of the State would extend to such cases, as well as to those in which it was sought to legislate in behalf of the health, peace and morals of the people. In view of the commercial anarchy and confusion that would result from the diverse exertions of power by the several States of the Union, it cannot be supposed that the Constitution or Congress have intended to limit the freedom, of commercial intercourse among the people of the several States."

Many of the cases bearing upon the subject are cited and considered in these opinions, and among others *The License Cases*, 5 How. 504, wherein laws passed by Massachusetts, New Hampshire and Rhode Island, in reference to the sale of spirituous liquors, came under review and were sustained, although the members of the court who participated in the decisions did not concur in any common ground upon which to rest them. That of *Peirce et al.* v. *New Hampshire* is perhaps the most important to be referred to here. In that case the defendants had been fined for selling a barrel of gin in New Hampshire which they had bought in Boston and brought coastwise to Portsmouth, and there sold in the same barrel and in the same condition in which it was purchased in Massachusetts, but contrary to the law of New Hampshire in that behalf. The conclusion of the opinion of Mr. Chief Justice Taney is in these words, p. 586 : "Upon the whole, therefore, the law of New Hampshire is in my judgment a valid one. For, although the gin sold was an import from another State, and Congress have clearly the power to regulate such importations, under the grant of power to regulate commerce among the several States, yet, as Congress has made no regulation on the subject, the traffic in the article may be lawfully regulated by the State as soon as it is landed in its territory, and a tax imposed upon it, or a license required, or the sale altogether prohibited, according to the policy which the State may suppose to be its interest or duty to pursue."

Referring to the cases of Massachusetts and Rhode Island,

the Chief Justice, after saying that if the laws of those States came in collision with the laws of Congress authorizing the importation of spirits and distilled liquors, it would be the duty of the court to declare them void, thus continues, p. 576:
" It has, indeed, been suggested, that, if a State deems the traffic in ardent spirits to be injurious to its citizens, and calculated to introduce immorality, vice and pauperism into the State, it may constitutionally refuse to permit its importation, notwithstanding the laws of Congress; and that a State may do this upon the same principles that it may resist and prevent the introduction of disease, pestilence or pauperism from abroad. But it must be remembered that disease, pestilence and pauperism are not subjects of commerce, although sometimes among its attendant evils. They are not things to be regulated and trafficked in, but to be prevented, as far as human foresight or human means can guard against them. But spirits and distilled liquors are universally admitted to be subjects of ownership and property, and are therefore subjects of exchange, barter and traffic, like any other commodity in which a right of property exists. And Congress, under its general power to regulate commerce with foreign nations, may prescribe what article of merchandise shall be admitted and what excluded; and may therefore admit, or not, as it shall deem best, the importation of ardent spirits. And inasmuch as the laws of Congress authorize their importation, no State has a right to prohibit their introduction. . . . These state laws act altogether upon the retail or domestic traffic within their respective borders. They act upon the article after it has passed the line of foreign commerce, and become a part of the general mass of property in the State. These laws may, indeed, discourage imports, and diminish the price which ardent spirits would otherwise bring. But although a State is bound to receive and to permit the sale by the importer of any article of merchandise which Congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law which it may deem necessary or advisable to guard the health or morals of its citizens, although such law may discourage importation, or

diminish the profits of the importer, or lessen the revenue of the general government. And if any State deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice or debauchery, I see nothing in the Constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper."

· The New Hampshire case, the chief justice observed, differs from *Brown* v. *Maryland*, in that the latter was a case arising out of commerce with foreign nations, which Congress had regulated by law; whereas the case in hand was one of commerce between two States, in relation to which Congress had not exercised its power. "But the law of New Hampshire, acts directly upon an import from one State to another, while in the hands of the importer for sale, and is therefore a regulation of commerce, acting upon the article while it is within the admitted jurisdiction of the general government, and subject to its control and regulation. The question, therefore, brought up for decision is, whether a State is prohibited by the Constitution of the United States from making any regulations of foreign commerce, or of commerce with another State, although such regulation is confined to its own territory, and made for its own convenience or interest, and does not come in conflict with any law of Congress. In other words, whether the grant of power to Congress is of itself a prohibition to the States, and renders all state laws upon the subject null and void." p. 578. He declares it to appear to him very clear, p. 579, " that the mere grant of power to the general government cannot, upon any just principles of construction, be construed to be an absolute prohibition to the exercise of any power over the same subject by the States. The controlling and supreme power over commerce with foreign nations and the several States is undoubtedly conferred upon Congress. Yet, in my judgment, the State may, nevertheless, for the safety or convenience of trade, or for the protection of the health of its citizens, make regulations of commerce for its own ports and harbors, and for its own territory; and such regulations are valid unless they come in conflict with a law

of Congress." He comments on the omission of any prohibition in terms, and concludes that if, as he thinks, "the framers of the Constitution (knowing that a multitude of minor regulations must be necessary, which Congress amid its great concerns could never find time to consider and provide) intended merely to make the power of the federal government supreme upon this subject over that of the States, then the omission of any prohibition is accounted for, and is consistent with the whole instrument. The supremacy of the laws of Congress, in cases of collision with state laws, is secured in the article which declares that the laws of Congress, passed in pursuance of the powers granted, shall be the supreme law; and it is only where both governments may legislate on the same subject that this article can operate." And he considers that the legislation of Congress and the States has conformed to this construction from the foundation of the government, as exemplified in state laws in relation to pilots and pilotage and health and quarantine laws.

But conceding the weight properly to be ascribed to the judicial utterances of this eminent jurist, we are constrained to say that the distinction between subjects in respect of which there can be of necessity only one system or plan of regulation for the whole country, and subjects local in their nature, and, so far as relating to commerce, mere aids rather than regulations, does not appear to us to have been sufficiently recognized by him in arriving at the conclusions announced. That distinction has been settled by repeated decisions of this court, and can no longer be regarded as open to re-examination. After all, it amounts to no more than drawing the line between the exercise of power over commerce with foreign nations and among the States and the exercise of power over purely local commerce and local concerns.

The authority of *Peirce* v. *New Hampshire*, in so far as it rests on the view that the law of New Hampshire was valid because Congress had made no regulation on the subject, must be regarded as having been distinctly overthrown by the numerous cases hereinafter referred to.

The doctrine now firmly established is, as stated by Mr. Justice Field, in *Bowman* v. *Chicago &c. Railway Co.*, 125 U. S. 507, "that where the subject upon which Congress can act under its commercial power is local in its nature or sphere of operation, such as harbor pilotage, the improvement of harbors, the establishment of beacons and buoys to guide vessels in and out of port, the construction of bridges over navigable rivers, the erection of wharves, piers and docks, and the like, which can be properly regulated only by special provisions adapted to their localities, the State can act until Congress interferes and supersedes its authority; but where the subject is national in its character, and admits and requires uniformity of regulation, affecting alike all the States, such as transportation between the States, including the importation of goods from one State into another, Congress can alone act upon it and provide the needed regulations. The absence of any law of Congress on the subject is equivalent to its declaration that commerce in that matter shall be free. Thus the absence of regulations as to interstate commerce with reference to any particular subject is taken as a declaration that the importation of that article into the States shall be unrestricted. It is only after the importation is completed, and the property imported has mingled with and become a part of the general property of the State, that its regulations can act upon it, except so far as may be necessary to insure safety in the disposition of the import until thus mingled."

The conclusion follows that, as the grant of the power to regulate commerce among the States, so far as one system is required, is exclusive, the States cannot exercise that power without the assent of Congress, and, in the absence of legislation, it is left for the courts to determine when state action does or does not amount to such exercise, or, in other words, what is or is not a regulation of such commerce. When that is determined, controversy is at an end. Illustrations exemplifying the general rule are numerous. Thus we have held the following to be regulations of interstate commerce: A tax upon freight transported from State to State, *Case of the State Freight Tax*, 15 Wall. 232; a statute imposing a burdensome condi-

tion on ship-masters as a prerequisite to the landing of passengers, *Henderson* v. *Mayor of New York*, 92 U. S. 259; a statute prohibiting the driving or conveying of any Texas, Mexican or Indian cattle, whether sound or diseased, into the State between the first day of March and the first day of November in each year, *Railroad Co.* v. *Husen*, 95 U. S. 465; a statute requiring every auctioneer to collect and pay into the state treasury a tax on his sales, when applied to imported goods in the original packages by him sold for the importer, *Cook* v. *Pennsylvania*, 97 U. S. 566; a statute intended to regulate or tax, or to impose any other restriction upon, the transmission of persons or property, or telegraphic messages, from one State to another, *Wabash, St. Louis &c. Railway* v. *Illinois*, 118 U. S. 557; a statute levying a tax upon nonresident drummers offering for sale or selling goods, wares or merchandise by sample, manufactured or belonging to citizens of other States, *Robbins* v. *Shelby Taxing District*, 120 U. S. 489.

On the other hand, we have decided, in *County of Mobile* v. *Kimball*, 102 U. S. 691, that a state statute providing for the improvement of the river, bay and harbor of Mobile, since what was authorized to be done was only as a mere aid to commerce, was, in the absence of action by Congress, not in conflict with the Constitution; in *Escanaba Co.* v. *Chicago*, 107 U. S. 678, that the State of Illinois could lawfully authorize the city of Chicago to deepen, widen and change the channel of, and construct bridges over, the Chicago River; in *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, that the jurisdiction and control of wharves properly belong to the States in which they are situated unless otherwise provided; in *Brown* v. *Houston*, 114 U. S. 622, that a general state tax laid alike upon all property is not unconstitutional, because it happens to fall upon goods which, though not then intended for exportation, are subsequently exported; in *Morgan Steamship Co.* v. *Louisiana Board of Health*, 118 U. S. 455, that a state law, requiring each vessel passing a quarantine station to pay a fee for examination as to her sanitary condition and the ports from which she came, was a rightful exer-

cise of police power; in *Smith* v. *Alabama*, 124 U. S. 465, and in *Nashville &c. Railway Co.* v. *Alabama*, 128 U. S. 96, that a state statute requiring locomotive engineers to be examined and obtain a license was not in its nature a regulation of commerce; and in *Kimmish* v. *Ball*, 129 U. S. 217, that a statute providing that a person having in his possession Texas cattle, which had not been wintered north of the southern boundary of Missouri at least one winter, shall be liable for any damages which may accrue from allowing them to run at large, and thereby spread the disease known as the Texas fever, was constitutional.

We held also in *Welton* v. *The State of Missouri*, 91 U. S. 275, that a state statute requiring the payment of a license tax from persons dealing in goods, wares and merchandise, which are not the growth, produce or manufacture of the State, by going from place to place to sell the same in the State, and requiring no such license tax from persons selling in a similar way goods which are the growth, produce or manufacture of the State, is an unconstitutional regulation; and to the same effect in *Walling* v. *Michigan*, 116 U. S. 446, in relation to a tax upon non-resident sellers of intoxicating liquors to be shipped into a State from places without it.   But it was held in *Patterson* v. *Kentucky*, 97 U. S. 501, and in *Webber* v. *Virginia*, 103 U. S. 344, that the right conferred by the patent laws of the United States did not remove the tangible property in which an invention might take form from the operation of the laws of the State, nor restrict the power of the latter to protect the community from direct danger inherent in particular articles.

In *Mugler* v. *Kansas*, 123 U. S. 623, it was adjudged that "state legislation which prohibits the manufacture of spirituous, malt, vinous, fermented or other intoxicating liquors within the limits of the State, to be there sold or bartered for general use as a beverage, does not necessarily infringe any right, privilege or immunity secured by the Constitution of the United States, or by the amendments thereto."   And this was in accordance with our decisions in *Bartemeyer* v. *Iowa*, 18 Wall. 129; *Beer Company* v. *Massachusetts*, 97 U. S.

25; and *Foster* v. *Kansas*, 112 U. S. 201. So in *Kidd* v. *Pearson*, 128 U. S. 1, it was held that a state statute which provided (1) that foreign intoxicating liquors may be imported into the State, and there kept for sale by the importer, in the original packages, or for transportation in such packages and sale beyond the limits of the State; and (2) that intoxicating liquors may be manufactured and sold within the State for mechanical, medicinal, culinary and sacramental purposes, but for no other, not even for the purpose of transportation beyond the limits of the State, was not an undertaking to regulate commerce among the States. And in *Eilenbecker* v. *District Court of Plymouth County*, 134 U. S. 31, 40, we affirmed the judgment of the Supreme Court of Iowa, sustaining the sentence of the district court of Plymouth in that State, imposing a fine of $500 and costs, and imprisonment in jail for three months, if the fine was not paid within thirty days, as a punishment for contempt in refusing to obey a writ of injunction issued by that court, enjoining and restraining the defendant from selling or keeping for sale any intoxicating liquors, including ale, wine and beer, in Plymouth County. Mr. Justice Miller there remarked: "If the objection to the statute is that it authorizes a proceeding in the nature of a suit in equity to suppress the manufacture and sale of intoxicating liquors which are by law prohibited, and to abate the nuisance which the statute declares such acts to be, wherever carried on, we respond that, so far as at present advised, it appears to us that all the powers of a court, whether at common law or in chancery, may be called into operation by a legislative body for the purpose of suppressing this objectionable traffic; and we know of no hindrance in the Constitution of the United States to the form of proceedings, or to the court in which this remedy shall be had. Certainly, it seems to us to be quite as wise to use the processes of the law and the powers of a court to prevent the evil, as to punish the offence as a crime after it has been committed."

These decisions rest upon the undoubted right of the States of the Union to control their purely internal affairs, in doing which they exercise powers not surrendered to the national

government; but whenever the law of the State amounts essentially to a regulation of commerce with foreign nations or among the States, as it does when it inhibits, directly or indirectly, the receipt of an imported commodity or its disposition before it has ceased to become an article of trade between one State and another, or another country and this, it comes in conflict with a power which, in this particular, has been exclusively vested in the general government, and is therefore void.

In *Mugler* v. *Kansas, supra,* the court said (p. 662) that it could not "shut out of view the fact, within the knowledge of all, that the public health, the public morals and the public safety may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism and crime existing in the country are, in some degree at least, traceable to this evil." And that "if in the judgment of the legislature [of a State] the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. . . . Nor can it be said that government interferes with or impairs any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks, for general or individual use, as a beverage, are, or may become, hurtful to society, and constitute, therefore, a business in which no one may lawfully engage." Undoubtedly, it is for the legislative branch of the state governments to determine whether the manufacture of particular articles of traffic, or the sale of such articles, will injuriously affect the public, and it is not for Congress to determine what measures a State may properly adopt as appropriate or needful for the protection of the public morals, the public health or the public safety; but notwithstanding it is not vested with supervisory power over matters of local administration. the responsibility is upon Congress, so far as the

regulation of interstate commerce is concerned, to remove the restriction upon the State in dealing with imported articles of trade within its limits, which have not been mingled with the common mass of property therein, if in its judgment the end to be secured justifies and requires such action.

Prior to 1888 the statutes of Iowa permitted the sale of foreign liquors imported under the laws of the United States, provided the sale was by the importer in the original casks or packages, and in quantities not less than those in which they were required to be imported ; and the provisions of the statute to this effect were declared by the Supreme Court of Iowa, in *Pearson* v. *International Distillery*, 72 Iowa, 348, 354, to be "intended to conform the statute to the doctrine of the United States Supreme Court, announced in *Brown* v. *Maryland*, 12 Wheat. 419, and *License Cases*, 5 How. 504, so that the statute should not conflict with the laws and authority of the United States." But that provision of the statute was repealed in 1888, and the law so far amended that we understand it now to provide that, whether imported or not, wine cannot be sold in Iowa except for sacramental purposes, nor alcohol except for specified chemical purposes, nor intoxicating liquors, including ale and beer, except for pharmaceutical and medicinal purposes, and not at all except by citizens of the State of Iowa, who are registered pharmacists and have permits obtained as prescribed by the statute, a permit being also grantable to one discreet person in any township where a pharmacist does not obtain it.

The plaintiffs in error are citizens of Illinois, are not pharmacists, and have no permit, but import into Iowa beer, which they sell in original packages, as described. Under our decision in *Bowman* v. *Chicago &c. Railway Co.*, *supra*, they had the right to import this beer into that State, and in the view which we have expressed they had the right to sell it, by which act alone it would become mingled in the common mass of property within the State. Up to that point of time, we hold that in the absence of congressional permission to do so, the State had no power to interfere by seizure, or any other action, in prohibition of importation and sale by the for-

eign or non-resident importer. Whatever our individual views may be as to the deleterious or dangerous qualities of particular articles, we cannot hold that any articles which Congress recognizes as subjects of interstate commerce are not such, or that whatever are thus recognized can be controlled by state laws amounting to regulations, while they retain that character; although, at the same time, if directly dangerous in themselves, the State may take appropriate measures to guard against injury before it obtains complete jurisdiction over them. To concede to a State the power to exclude, directly or indirectly, articles so situated, without congressional permission, is to concede to a majority of the people of a State, represented in the state legislature, the power to regulate commercial intercourse between the States, by determining what shall be its subjects, when that power was distinctly granted to be exercised by the people of the United States, represented in Congress, and its possession by the latter was considered essential to that more perfect Union which the Constitution was adopted to create. Undoubtedly, there is difficulty in drawing the line between the municipal powers of the one government and the commercial powers of the other, but when that line is determined, in the particular instance, accommodation to it, without serious inconvenience, may readily be found, to use the language of Mr. Justice Johnson, in *Gibbons* v. *Ogden*, 9 Wheat. 1, 238, in "a frank and candid coöperation for the general good."

The legislation in question is to the extent indicated repugnant to the third clause of section 8 of Art. 1 of the Constitution of the United States, and therefore the judgment of the Supreme Court of Iowa is

*Reversed and the cause remanded for further proceedings not inconsistent with this opinion.*

Mr. Justice Gray, with whom concurred Mr. Justice Harlan and Mr. Justice Brewer, dissenting.

Mr. Justice Harlan, Mr. Justice Brewer and myself are unable to concur in this judgment. As our dissent is based on

the previous decisions of this court, the respect due to our associates, as well as to our predecessors, induces us to state our position, as far as possible, in the words in which the law has been heretofore declared from this bench.

The facts of the case, and the substance of the statutes whose validity is drawn in question, may be briefly stated.

It was an action of replevin of sundry kegs and cases of beer, begun in an inferior court of the State of Iowa against a constable of Lee County in Iowa, who had seized them at Keokuk in that county under a search-warrant issued by a justice of the peace pursuant to the statutes of Iowa, which prohibit the sale, the keeping for sale, or the manufacture for sale, of any intoxicating liquor (including malt liquor) for any purpose whatever, except for pharmaceutical, medicinal, chemical or sacramental purposes, and under an annual license granted by the district court of the proper county, upon being satisfied that the applicant is a citizen of the United States and of the State of Iowa, and a resident of the county, and otherwise qualified.

The plaintiffs were citizens and residents of the State of Illinois, engaged as brewers in manufacturing beer at Peoria in that State, and in selling it in the States of Illinois and Iowa. The beer in question was manufactured by them at Peoria, and there put up by them in said kegs and cases; each keg being sealed, and having upon it, over the plug at the opening, a United States internal revenue stamp; and each case being substantially made of wood, containing two dozen quart bottles of beer, and sealed with a metallic seal which had to be broken in order to open the case. The kegs and cases owned by the plaintiffs, and so sealed, were transported by them from Peoria by railway to Keokuk, and there sold and offered for sale by their agent, in a building owned by one of them, and without breaking or opening the kegs or cases.

The Supreme Court of Iowa having given judgment for the defendant, the question presented by this writ of error is whether the statutes of Iowa, as applied to these facts, contravene section 8 of article 1, or section 2 of article 4 of the Constitution of the United States, or section 1 of article 14 of the Amendments to the Constitution.

By section 8 of article 1 of the Constitution, " the Congress shall have power," among other things, " to regulate commerce with foreign nations, and among the several States," and " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

By section 2 of article 4, " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."

By section 1 of the Fourteenth Amendment, " no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ; nor shall any State deprive any person of life, liberty or property, without due process of law ; nor deny to any person within its jurisdiction the equal protection of the laws."

By the Tenth Amendment, " the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Among the powers thus reserved to the several States is what is commonly called the police power — that inherent and necessary power, essential to the very existence of civil society, and the safeguard of the inhabitants of the State against disorder, disease, poverty and crime.

" The police power belonging to the States in virtue of their general sovereignty," said Mr. Justice Story, delivering the judgment of this court, " extends over all subjects within the territorial limits of the States ; and has never been conceded to the United States." *Prigg* v. *Pennsylvania,* 16 Pet. 539, 625. This is well illustrated by the recent adjudications that a statute prohibiting the sale of illuminating oils below a certain fire-test is beyond the constitutional power of Congress to enact, except so far as it has effect within the United States (as, for instance, in the District of Columbia) and without the limits of any State ; but that it is within the constitutional power of a State to pass such a statute, even as to oils manufactured under letters patent from the United States. *United States* v. *Dewitt,* 9 Wall. 41 ; *Patterson* v. *Kentucky,* 97 U. S. 501.

The police power includes all measures for the protection of the life, the health, the property and the welfare of the inhabitants, and for the promotion of good order and the public morals. It covers the suppression of nuisances, whether injurious to the public health, like unwholesome trades, or to the public morals, like gambling houses and lottery tickets. *Slaughterhouse Cases*, 16 Wall. 36, 62, 87; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659 ; *Phalan* v. *Virginia*, How. 163, 168 ; *Stone* v. *Mississippi*, 101 U. S. 814.

This power, being essential to the maintenance of the authority of local government, and to the safety and welfare of the people, is inalienable. As was said by Chief Justice Waite, referring to earlier decisions to the same effect, " No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. The supervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them. For this purpose the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself." *Stone* v. *Mississippi*, 101 U. S. 814, 819. See also *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, 753 ; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 672; *New Orleans* v. *Houston*, 119 U. S. 265, 275.

The police power extends not only to things intrinsically dangerous to the public health, such as infected rags or diseased meat, but to things which, when used in a lawful manner, are subjects of property and of commerce, and yet may be used so as to be injurious or dangerous to the life, the health or the morals of the people. Gunpowder, for instance, is a subject of commerce and of lawful use, yet, because of its explosive and dangerous quality, all admit that the State may regulate its keeping and sale. And there is no article, the right of the State to control or to prohibit the sale or manufacture of which within its limits is better established, than

intoxicating liquors. *License Cases,* 5 How. 504; *Downham* .v. *Alexandria Council,* 10 Wall. 173; *Bartemeyer* v. *Iowa,.* 18 Wall. 129; *Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Tiernan* v. *Rinker,* 102 U. S. 123; *Foster* v. *Kansas,* 112 U. S. 201; .*Mugler* v. *Kansas* and *Kansas* v. *Ziebold,* 123. U. S. 623; *Kidd* v. *Pearson,* 128 U. S. 1; *Eilenbecker* v. *Plymouth County Court,* 134 U. S. 31.

In *Beer Co.* v. *Massachusetts,* above cited, this court, affirming the judgment of the Supreme Judicial Court of Massachusetts, reported in 115 Mass. 153, held that a statute of the State, prohibiting the manufacture and sale of intoxicating liquors, including malt liquors, except as therein provided, applied to a corporation which the State had long before chartered, and authorized to hold real and personal property, for the purpose of manufacturing malt liquors. Among the reasons assigned by this court for its judgment, were the following:

"If. the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the State."

"Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, *salus populi suprema lex;* and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself."

"Since we have already held, in the case of *Bartemeyer* v. *Iowa,* that as a measure of police regulation, looking to the

preservation of public morals, a state law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the Constitution of the United States, we see nothing in the present case that can afford any sufficient ground for disturbing the decision of the Supreme Court of Massachusetts." 97 U. S. 32, 33.

In *Mugler* v. *Kansas* and *Kansas* v. *Ziebold*, above cited, a statute of Kansas, prohibiting the manufacture or sale of intoxicating liquors as a beverage, and declaring all places, where such liquors were manufactured or sold in violation of the statute, to be common nuisances, and prohibiting their future use for the purpose, was held to be a valid exercise of the police power of the State, even as applied to persons who, long before the passage of the statute, had constructed buildings specially adapted to such manufacture.

It has also been adjudged that neither the grant of a license to sell intoxicating liquors, nor the payment of a tax on such liquors, under the internal revenue laws of the United States, affords any defence to an indictment by a State for selling the same liquors contrary to its statutes. *License Tax Cases,* 5 Wall. 462; *Pervear* v. *Commonwealth,* 5 Wall. 475.

The clause of the Constitution, which declares that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States," has no bearing upon this case. The privileges and immunities thus secured are those fundamental rights and privileges which appertain to citizenship. *Conner* v. *Elliott,* 18 How. 591, 593 ; Curtis, J., in *Scott* v. *Sandford,* 19 How. 393, 580 ; *Paul* v. *Virginia,* 8 Wall. 168, 180; *McCready* v. *Virginia,* 94 U. S. 391, 395. As observed by the court in *Bartemeyer* v. *Iowa,* "The right to sell intoxicating liquors, so far as such a right exists, is not one of the rights growing out of citizenship of the United States." 18 Wall. 133.

Nor is the case affected by the Fourteenth Amendment of the Constitution. As was said in the unanimous opinion of this court in *Barbier* v. *Connolly,* after stating the true scope of that amendment, "But neither the amendment — broad and comprehensive as it is — nor any other amendment, was

designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity." 113 U. S. 27, 31. Upon that ground, the amendment has been adjudged not to apply to a state statute prohibiting the sale or manufacture of intoxicating liquors in buildings long before constructed for the purpose, or the sale of oleomargarine lawfully manufactured before the passage of the statute. *Mugler* v. *Kansas*, 123 U. S. 623, 663; *Powell* v. *Pennsylvania*, 127 U. S. 678, 683, 687.

The remaining and the principal question is, whether the statute of Iowa, as applied to the sale within that State of intoxicating liquors in the same cases or kegs, unbroken and unopened, in which they were brought by the seller from another State, is repugnant to the clause of the Constitution granting to Congress the power to regulate commerce with foreign nations and among the several States.

In the great and leading case of *Gibbons* v. *Ogden*, 9 Wheat. 1, the point decided was that acts of the legislature of New York, granting to certain persons for a term of years the exclusive navigation by steamboats of all waters within the jurisdiction of the State, were, so far as they affected such navigation by vessels of other persons licensed under the laws of the United States, repugnant to the clause of the Constitution empowering Congress to regulate foreign and interstate commerce.

Chief Justice Marshall, in delivering judgment, after speaking of the inspection laws of the States, and observing that they had a remote and considerable influence on commerce, but that the power to pass them was not derived from a power to regulate commerce, said: "They form a portion of that immense mass of legislation, which embraces everything within the territory of a State, not surrendered to the general government: all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating

the internal commerce of a State, and those which respect turnpike roads, ferries, etc., are component parts of this mass. No direct general power over these objects is granted to Congress; and, consequently, they remain subject to state legislation. If the legislative power of the Union can reach them, it must be for national purposes; it must be where the power is expressly given for a special purpose, or is clearly incidental to some power which is expressly given." pp. 203, 204. Again; he said that quarantine and health laws "are considered as flowing from the acknowledged power of a State, to provide for the health of its citizens," and that the constitutionality of such laws had never been denied. p. 205.

Mr. Justice Johnson, in his concurring opinion, said: "It is no objection to the existence of distinct, substantive powers, that, in their application, they bear upon the same subject. The same bale of goods, the same cask of provisions, or the same ship, that may be the subject of commercial regulation, may also be the vehicle of disease. And the health laws that require them to be stopped and ventilated are no more intended as regulations on commerce, than the laws which permit their importation are intended to inoculate the community with disease. Their different purposes mark the distinction between the powers brought into action; and while frankly exercised, they can produce no serious collision." p. 235.

That Chief Justice Marshall and his associates did not consider the constitutional grant of power to Congress to regulate foreign and interstate commerce as, of its own force, and without national legislation, impairing the police power of each State within its own borders to protect the health and welfare of its inhabitants, is clearly indicated in the passages above quoted from the opinions in *Gibbons* v. *Ogden*, and is conclusively proved by the unanimous judgment of the court delivered by the Chief Justice five years later in *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245.

In that case, the legislature of Delaware had authorized a dam to be erected across a navigable tide-water creek which opened into Delaware Bay, thereby obstructing the navigation of the creek by a vessel enrolled and licensed under the navi-

gation laws of the United States. The decision in *Gibbons* v. *Ogden* was cited by counsel, as conclusive against the validity of the statute of the State. But its validity was upheld by the court, for the following reasons:

"The act of assembly, by which the plaintiffs were authorized to construct their dam, shows plainly that this is one of those many creeks, passing through a deep level marsh adjoining the Delaware, up which the tide flows for some distance. The value of the property on its banks must be enhanced by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the States. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance.

"The counsel for the plaintiffs in error insists that it comes in conflict with the power of the United States 'to regulate commerce with foreign nations and among the several States.'

"If Congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern States; we should feel not much difficulty in saying that a state law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question.

"We do not think that the act empowering the Blackbird Creek Marsh Company to place a dam across the creek can, under all the circumstances of the case, be considered as

repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject." 2 Pet. 251, 252.

In *Brown* v. *Maryland*, 12 Wheat. 419, the point decided was that an act of the legislature of Maryland, requiring all importers of foreign goods by the bale or package, or of spirituous liquors, and "other persons selling the same by wholesale, bale or package, hogshead, barrel or tierce," to first take out a license and pay fifty dollars for it, and imposing a penalty for failure to do so, was, as applied to sales by an importer of foreign liquors in the original packages, unconstitutional, both as laying an impost, and as repugnant to the power of Congress to regulate foreign commerce.

The statute there in question was evidently enacted to raise revenue from importers of foreign goods of every description, and not as an exercise of the police power of the State. And Chief Justice Marshall, in answering an argument of counsel, expressly admitted that the power to direct the removal of gunpowder, or the removal or destruction of infectious or unsound articles which endanger the public health, "is a branch of the police power, which unquestionably remains, and ought to remain, with the States." pp. 443, 444.

Moreover, the question there presented and decided concerned foreign commerce only, and not commerce among the States. Chief Justice Marshall, at the outset of his opinion, so defined it, saying : "The cause depends entirely on the question, whether the legislature of a State can constitutionally require the importer of foreign articles to take out a license from the State, before he shall be permitted to sell a bale or package so imported." p. 436.

It is true, that, after discussing and deciding that question, he threw out this brief remark : "It may be proper to add, that we suppose the principles laid down in this case, to apply equally to importations from a sister State." p. 449. But this remark was *obiter dictum*, wholly aside from the question before the court and having no bearing on its decision, and therefore extrajudicial, as has since been noted by Chief Justice Taney and Mr. Justice McLean in the *License Cases*,

5 How. 504, 575, 578, 594, and by Mr. Justice Miller in *Woodruff* v. *Parham*, 8 Wall. 123, 139.

To a remark made under such circumstances are peculiarly applicable the warning words of Chief Justice Marshall himself in an earlier case, where, having occasion to explain away some dicta of his own in delivering judgment in *Marbury* v. *Madison*, 1 Cranch, 137, he said: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles, which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." *Cohens* v. *Virginia*, 6 Wheat. 264, 399, 400. Another striking instance in which that maxim has been applied and acted on is to be found in the opinion of the court at the present term in *Hans* v. *Louisiana*, 134 U. S. 1, 20.

But the unanimous judgment of this court in 1847 in *Peirce* v. *New Hampshire*, reported together with *Thurlow* v. *Massachusetts* and *Fletcher* v. *Rhode Island* as the *License Cases*, 5 How. 504, is directly in point, and appears to us conclusively to govern the case at bar. Those cases were elaborately argued by eminent counsel, and deliberately considered by the court, and Chief Justice Taney, as well as each of six associate justices, stated his reasons for concurring in the judgment.

The cases from Massachusetts and Rhode Island arose under statutes of either State, prohibiting sales of spirituous liquors by any person, in less than certain quantities, without first having obtained an annual license from municipal officers; in the one case, from county commissioners, who, by the express terms of the statute, were not required to grant any licenses when in their opinion the public good did not require them to be granted; and in the other case, from a town council, who

were forbidden to grant licenses whenever the voters of the town in town meeting decided that none should be granted. Mass. Rev. Stat. 1836, c. 47, §§ 3, 17, 23–25; Stat. 1837, c. 42, § 2; R. I. Pub. Laws of 1844, p. 496, § 4; Laws of 1845, p. 72; 5 How. 506–510, 540. Those statutes were held to be constitutional, as applied to foreign liquors which had passed out of the hands of the importer; while it was assumed that, under the decision in *Brown* v. *Maryland,* those statutes could be allowed no effect as to such liquors while they remained in the hands of the importer in the original packages upon which duties had been paid to the United States. 5 How. 576, 590, 610, 618.

The case of *Peirce* v. *New Hampshire* directly involved the validity, as applied to liquors brought in from another State, of a statute of New Hampshire, which imposed a penalty on any person selling any wine, rum, gin, brandy or other spirits, in any quantity, "without license from the selectmen of the town or place where such person resides." N. H. Laws of 1838, c. 369; 5 How. 555. The plaintiffs in error, having been indicted under that statute for selling to one Aaron Sias in the town of Dover in the State of New Hampshire one barrel of gin, without license from the selectmen of the town, at the trial admitted that they so sold to him a barrel of American gin; and introduced evidence that "the barrel of gin was purchased by the defendants in Boston in the Commonwealth of Massachusetts, brought coastwise to the landing at Piscataqua Bridge, and from thence to the defendant's store in Dover, and afterwards sold to Sias in the same barrel and in the same condition in which it was purchased in Massachusetts." The defendants contended that the statute was unconstitutional, because it was "in violation of certain public treaties of the United States with Holland, France and other countries, containing stipulations for the admission of spirits into the United States;" and because it was repugnant to the clauses of the Constitution of the United States restricting the power of the States to lay duties on imports or exports, and granting the power to Congress to regulate commerce with foreign nations and among the several States. Chief Justice Parker

instructed the jury "that this State could not regulate commerce between this and other States; that this State could not prohibit the introduction of articles from another State with such a view, nor prohibit a sale of them with such a purpose; but that, although the State could not make such laws with such views and for such purposes, she was not entirely forbidden to legislate in relation to articles introduced from foreign countries or from other States; that she might tax them the same as other property, and might regulate the sale to some extent; that a State might pass health and police laws, which would, to a certain extent, affect foreign-commerce and commerce between the States; and that this statute was a regulation of that character, and constitutional." After a verdict of guilty, exceptions to this instruction were overruled by the highest court of the State. 5 How. 554–557; 13 N. H. 536.

In that case, as in the case at bar, the statute of the State prohibited sales of intoxicating liquors by any person without a license from municipal authorities, and authorized licenses to be granted only to persons residing within the State; and the liquors were sold within the State by the importer, and in the same barrel, keg or case, unbroken and in the same condition, in which he had brought them from another State. Yet the judgment of the highest court of New Hampshire was unanimously affirmed by this court.

Chief Justice Taney, Mr. Justice Catron and Mr. Justice Nelson were of opinion that the statute of New Hampshire was a regulation of interstate commerce, but yet valid so long as it was not in conflict with any act of Congress.

Chief Justice Taney, after recognizing that "spirits and distilled liquors are universally admitted to be subjects of ownership and property, and are therefore subjects of exchange, barter and traffic, like any other commodity in which a right of property exists; and Congress, under its general power to regulate commerce with foreign nations, may prescribe what article of merchandise shall be admitted and what excluded, and may therefore admit, or not, as it shall deem best, the importation of ardent spirits; and inasmuch as the laws of Congress authorize their importation, no State has a

right to prohibit their introduction;" and yet upholding the validity of the statutes of Massachusetts and Rhode Island, as not interfering with the trade in ardent spirits while they remained a part of foreign commerce, and were in the hands of the importer for sale, in the cask or vessel in which the laws of Congress authorized them to be imported; p. 577; proceeded to state the case from New Hampshire as follows:

"The present case, however, differs from *Brown* v. *Maryland* in this: that the former was one arising out of commerce with foreign nations, which Congress has regulated by law; whereas the present is a case of commerce between two States, in relation to which Congress has not exercised its power. Some acts of Congress have indeed been referred to in relation to the coasting trade. But they are evidently intended merely to prevent smuggling, and do not regulate imports or exports from one State to another. This case differs also from the cases of Massachusetts and Rhode Island; because, in these two cases, the laws of the States operated upon the articles after they had passed beyond the limits of foreign commerce, and consequently were beyond the control and power of Congress. But the law of New Hampshire acts directly upon an import from one State to another, while in the hands of the importer for sale, and is therefore a regulation of commerce, acting upon the article while it is within the admitted jurisdiction of the general government, and subject to its control and regulation." p. 578. And he concluded his opinion thus: "Upon the whole, therefore, the law of New Hampshire is, in my judgment, a valid one. For, although the gin sold was an import from another State, and Congress has clearly the power to regulate such importations, under the grant of power to regulate commerce among the several States, yet, as Congress has made no regulation on the subject, the traffic in the article may be lawfully regulated by the State as soon as it is landed in its territory, and a tax imposed upon it, or a license required, or the sale altogether prohibited, according to the policy which the State may suppose to be its interest or duty to pursue." p. 586.

Mr. Justice Catron expressed similar views. While he was

of opinion that the ultimate right of determining what commodities might be lawful subjects of interstate commerce belonged to Congress in the exercise of its power to regulate commerce, and not to the States in the exercise of the police power, he was equally clear that the statute of New Hampshire was a valid regulation, in the absence of any legislation upon the subject by Congress. After pointing out the difficulties standing in the way of any attempt by Congress to make the special and various regulations required at different places at the maritime or inland borders of the States, he said: "I admit that this condition of things does not settle the question of contested power; but it satisfactorily shows that Congress cannot do what the States have done, are doing and must continue to do, from a controlling necessity, even should the exclusive power in Congress be maintained by our decision." p. 606. "Congress has stood by for nearly sixty years, and seen the States regulate the commerce of the whole country, more or less, at the ports of entry and at all their borders, without objection; and for this court now to decide that the power did not exist in the States, and that all they had done in this respect was void from the beginning, would overthrow and annul entire codes of state legislation on the particular subject. We would by our decision expunge more state laws and city corporate regulations than Congress is likely to make in a century on the same subject; and on no better assumption than that Congress and the state legislatures had been altogether mistaken as to their respective powers for fifty years and more. If long usage, general acquiescence and the absence of complaint can settle the interpretation of the clause in question, then it should be deemed as settled in conformity to the usage by the courts." p. 607. And finally, in summing up his conclusions, he said: "That the law of New Hampshire was a regulation of commerce among the States in regard to the article for selling of which the defendants were indicted and convicted; but that the state law was constitutionally passed, because of the power of the State thus to regulate; there being no regulation of Congress, special or general, in existence, to which the state law was repugnant." pp. 608, 609.

Mr. Justice Nelson expressed his concurrence in the opinions delivered by the Chief Justice and Mr. Justice Catron. p. 618.

Justices McLean, Daniel, Woodbury and Grier, on the other hand, were of opinion that the license laws of New Hampshire, as well as those of Massachusetts and Rhode Island, were merely police regulations and not regulations of commerce, although they might incidentally affect commerce.

Mr. Justice McLean, in the course of his opinion in *Thurlow* v. *Massachusetts,* said: " The license acts of Massachusetts do not purport to be a regulation of commerce. They are essentially police laws. Enactments similar in principle are common to all the States. Since the adoption of its constitution they have existed in Massachusetts." p. 588. [Mass. Stats. 1786, c. 68; 1792, c. 25; 7 Dane Ab. 43, 44.] " It is the settled construction of every regulation of commerce, that, under the sanction of its general laws, no person can introduce into a community malignant diseases, or anything which contaminates its morals, or endangers its safety. And this is an acknowledged principle applicable to all general regulations. Individuals in the enjoyment of their own rights must be careful not to injure the rights of others. From the explosive nature of gunpowder, a city may exclude it. Now this is an article of commerce, and is not known to carry infectious disease; yet, to guard against a contingent injury, a city may prohibit its introduction. These exceptions are always implied in commercial regulations, where the general government is admitted to have the exclusive power. They are not regulations of commerce, but acts of self-preservation. And though they affect commerce to some extent, yet such effect is the result of the exercise of an undoubted power in the State." pp. 589, 590. " A discretion on this subject must be exercised somewhere, and it can be exercised nowhere but under the state authority. The State may regulate the sale of foreign spirits, and such regulation is valid, though it reduce the quantity of spirits consumed. This is admitted. And how can this discretion be controlled? The powers of the general government do not extend to it. It is in every

aspect a local regulation, and relates exclusively to the internal police of the State." p. 591. "The police power of a State and the foreign commercial power of Congress must stand together. Neither of them can be so exercised as materially to affect the other. The sources and objects of these powers are exclusive, distinct and independent, and are essential to both governments." p. 592.

In his opinion in *Peirce* v. *New Hampshire*, he declared that the same views were equally applicable to that case; and added: "The tax in the form of a license, as here presented, counteracts no policy of the federal government, is repugnant to no power it can exercise, and is imposed by the exercise of an undoubted power in the State. The license system is a police regulation, and, as modified in the State of New Hampshire, was designed to restrain and prevent immoral indulgence, and to advance the moral and physical welfare of society." "If this tax had been laid on the property as an import into the State, the law would have been repugnant to the Constitution. It would have been a regulation of commerce among the States, which has been exclusively given to Congress." "But this barrel of gin, like all other property within the State of New Hampshire, was liable to taxation by the State. It comes under the general regulation, and cannot be sold without a license. The right of an importer of ardent spirits to sell in the cask, without a license, does not attach to the plaintiffs in error, on account of their having transported this property from Massachusetts to New Hampshire." pp. 595, 596.

Mr. Justice Daniel said: "The license laws of Massachusetts, Rhode Island and New Hampshire, now under review, impose no exaction on foreign commerce. They are laws simply determining the mode in which a particular commodity may be circulated within the respective jurisdictions of those States, vesting in their domestic tribunals a discretion in selecting the agents for such circulation, without discriminating between the sources whence commodities may have been derived. They do not restrict importation to any extent; they do not interfere with it, either in appearance or reality;

they do not prohibit sales, either by wholesale or retail; they assert only the power of regulating the latter, but this entirely within the sphere of their peculiar authority. These laws are, therefore, in violation neither of the Constitution of the United States, nor of any law nor treaty made in pursuance or under authority of the Constitution." p. 617.

Mr. Justice Woodbury repeated and enforced the same views, saying, among other things: "It is manifest, also, whether as an abstract proposition or practical measure, that a prohibition to import is one thing, while a prohibition to sell without license is another and entirely different. The first would operate on foreign commerce, on the voyage. The latter affects only the internal business of the State after the foreign importation is completed and on shore." p. 619. "The subject of buying and selling within a State is one as exclusively belonging to the power of the State over its internal trade, as that to regulate foreign commerce is with the general government, under the broadest construction of that power." "The idea, too, that a prohibition to sell would be tantamount to a prohibition to import does not seem to me either logical or founded in fact. For, even under a prohibition to sell, a person could import, as he often does, for his own consumption and that of his family and plantations; and also, if a merchant extensively engaged in commerce, often does import articles, with no view of selling them here, but of storing them for a higher and more suitable market in another State, or abroad." p. 620. "But this license is a regulation neither of domestic commerce between the States, nor of foreign commerce. It does not operate on either, or the imports of either, till they have entered the State and become component parts of its property. Then it has by the Constitution the exclusive power to regulate its own internal commerce and business in such articles, and bind all residents, citizens or not, by its regulations, if they ask its protection and privileges; and Congress, instead of being opposed and thwarted by regulations as to this, can no more interfere in it than the States can interfere in regulation of foreign commerce." p. 625. "Whether such laws of the States as to

licenses are to be classed as police measures, or as regulations of their internal commerce, or as taxation merely, imposed on local property and local business, and are to be justified by each or by all of them together, is of little consequence, if they are laws which from their nature and object must belong to all sovereign States. Call them by whatever name, if they are necessary to the well being and independence of all communities, they remain among the reserved rights of the States, no express grant of them to the general government having been either proper, or apparently embraced in the Constitution. So, whether they conflict or not, indirectly and slightly, with some regulations of foreign commerce, after the subject matter of that commerce touches the soil or waters within the limits of a State, is not perhaps very material, if they do not really relate to that commerce, or any other topic within the jurisdiction of the general government." p. 627.

Mr. Justice Grier did not consider the question of the exclusiveness of the power of Congress to regulate foreign and interstate commerce as involved in the decision, but maintained the validity of the statutes in question under "the police power, which is exclusively in the States." pp. 631, 632.

The other members of the court at that time were Mr. Justice Wayne and Mr. Justice McKinley, who do not appear by the report to have taken part in the decision of those cases, although the former appears at page 545 to have been present at the argument, and by the clerk's minutes to have been upon the bench when the judgments were delivered. It is certain that neither of them dissented from the decision of the court.

The consequences of an opposite conclusion in the case from New Hampshire, regarding liquors brought from one State into another, were forcibly stated by several of the judges.

Mr. Justice McLean said: " If the mere conveyance of property from one State to another shall exempt it from taxation, and from general state regulation, it will not be difficult to avoid the police laws of any State, especially by those who live at or near the boundary." p. 595.

Mr. Justice Catron said: " To hold that the state license

law was void, as respects spirits coming in from other States as articles of commerce, would open the door to an almost entire evasion, as the spirits might be introduced in the smallest divisible quantities that the retail trade would require; the consequence of which would be, that the dealers in New Hampshire would sell only spirits produced in other States, and that the products of New Hampshire would find an unrestrained market in the neighboring States having similar license laws to those of New Hampshire." p. 608.

Mr. Justice Woodbury said: "If the proposition was maintainable, that, without any legislation by Congress as to the trade between the States, (except that in coasting, as before explained, to prevent smuggling,) anything imported from another State, foreign or domestic, could be sold of right in the package in which it was imported, not subject to any license or internal regulation of a State, then it is obvious that the whole license system may be evaded and nullified, either from abroad, or from a neighboring State. And the more especially can it be done from the latter, as imports may be made in bottles of any size, down to half a pint, of spirits or wines; and if its sale cannot be interfered with and regulated, the retail business can be carried on in any small quantity, and by the most irresponsible and unsuitable persons, with perfect impunity." pp. 625, 626.

Mr. Justice Grier, in an opinion marked by his characteristic vigor and directness of thought and expression, (after saying that he mainly concurred with Mr. Justice McLean,) summed up the whole matter as follows:

"The true question presented by these cases, and one which I am not disposed to evade, is, whether the States have a right to prohibit the sale and consumption of an article of commerce which they believe to be pernicious in its effects, and the cause of disease, pauperism and crime. I do not consider the question of the exclusiveness of the power of Congress to regulate commerce as necessarily connected with the decision of this point.

"It has been frequently decided by this court, 'that the powers which relate to merely municipal regulations, or what

may more properly be called internal police, are not surrendered by the States, or restrained by the Constitution of the United States; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive.' Without attempting to define what are the peculiar subjects or limits of this power, it may safely be affirmed, that every law for the restraint and punishment of crime, for the preservation of the public peace, health and morals, must come within this category.

" As subjects of legislation, they are from their very nature of primary importance; they lie at the foundation of social existence; they are for the protection of life and liberty, and necessarily compel all laws on subjects of secondary importance, which relate only to property, convenience or luxury, to recede, when they come in conflict or collision, ' *salus populi suprema lex.*'

" If the right to control these subjects be ' complete, unqualified and exclusive ' in the state legislatures, no regulations of secondary importance can supersede or restrain their operations, on any ground of prerogative or supremacy. The exigencies of the social compact require that such laws be executed before and above all others.

" It is for this reason that quarantine laws, which protect the public health, compel mere commercial regulations to submit to their control. They restrain the liberty of the passengers; they operate on the ship which is the instrument of commerce, and its officers and crew, the agents of navigation. They seize the infected cargo, and cast it overboard. The soldier and the sailor, though in the service of the government, are arrested, imprisoned and punished for their offences against society. Paupers and convicts are refused admission into the country. All these things are done, not from any power which the States assume to regulate commerce or to interfere with the regulations of Congress, but because police laws for the preservation of health, prevention of crime and protection of the public welfare, must of necessity have full and free operation, according to the exigency which requires their interference.

"It is not necessary, for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism and crime which have their origin in the use or abuse of ardent spirits. The police power, which is exclusively in the States, is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority. There is no conflict of power, or of legislation, as between the States and the United States; each is acting within its sphere, and for the public good; and if a loss of revenue should accrue to the United States from a diminished consumption of ardent spirits, she will be the gainer a thousand fold in the health, wealth and happiness of the people." pp. 631, 632.

This abstract of the *License Cases* shows (what is made yet clearer by an attentive reading of the opinions as a whole) that the difference of opinion among the judges was upon the question whether the state statutes, which all agreed had some influence upon commerce, and all agreed were valid exercises of the police power, could properly be called regulations of commerce.

While many of the judges said or assumed that a State could not restrict the sale by the importer and in the original packages of intoxicating liquors imported from a foreign country, which Congress had authorized the importation of, and had caused duties to be levied upon; all of them undoubtingly held that, where Congress had not legislated, a State might, for the protection of the health, the morals and the safety of its inhabitants, restrict or prohibit, at its discretion and according to its own views of policy, the sale by the importer of intoxicating liquors brought into it from another State, and remaining in the barrels or packages in which they were brought in.

The ability and thoroughness with which those cases were argued at the bar and on the bench, the care and thought bestowed upon their consideration, as manifested in the opinions delivered by the several judges, and the confidence with which each judge expressed his concurrence in the result, make

the decision of the highest possible authority. It has been accepted and acted on as such by the legislatures, the courts and the people, of the nation and of the States, for forty years. It has not been touched by any act of Congress; it has guided the legislation of many of the States; and it has been treated as beyond question by this court in a long series of cases. *Veazie* v. *Moor* (1852), 14 How. 568, 575; *Sinnot* v. *Davenport* (1859), 22 How. 227, 243; *Gilman* v. *Philadelphia* (1865), 3 Wall. 713, 730; *Pervear* v. *Commonwealth* (1866), 5 Wall. 475, 479; *Woodruff* v. *Parham* (1868), 8 Wall. 123, 139; *United States* v. *Dewitt* (1869), 9 Wall. 41, 45; *Henderson* v. *Mayor of New York* (1875), 92 U. S. 259, 274; *Beer Co.* v. *Massachusetts* (1877), 97 U. S. 25, 33; *Patterson* v. *Kentucky* (1878), 97 U. S. 501, 503; *Mobile County* v. *Kimball* (1880), 102 U. S. 691, 701; *Brown* v. *Houston* (1885), 114 U. S. 622, 631; *Walling* v. *Michigan* (1886), 116 U. S. 446, 461; *Mugler* v. *Kansas* (1887), 123 U. S. 623, 657, 658.

In the *Passenger Cases*, 7 How. 283, decided in 1849, two years after the *License Cases*, statutes of New York and Massachusetts, imposing taxes upon alien passengers arriving from abroad, were adjudged to be repugnant to the Constitution and laws of the United States, and therefore void, by the opinions of Justices McLean, Wayne, Catron, McKinley and Grier, against the dissent of Chief Justice Taney and Justices Daniel, Nelson and Woodbury, each of the judges delivering a separate opinion. The decision in the *License Cases* was relied on by each of the dissenting judges; pp. 470, 483, 497, 518, 524, 559; and no doubt of the soundness of that decision was suggested in the opinions of the majority of the court, or in any of the cases in which the judgment of that majority was afterwards approved and followed. *Henderson* v. *Mayor of New York*, and *Commissioners of Immigration* v. *North German Lloyd*, 92 U. S. 259; *Chy Lung* v. *Freeman*, 92 U. S. 275; *People* v. *Compagnie Générale Transatlantique*, 107 U. S. 59; *Head Money Cases*, 112 U. S. 580.

When Mr. Justice Grier, in the *Passenger Cases*, 7 How. 462, said, "And to what weight is that argument entitled, which assumes, that, because it is the policy of Congress to

leave this intercourse free, therefore it has not been regulated; and each State may put as many restrictions upon it as she pleases?" the context shows that he had in mind cases in which the policy to leave commerce free had been manifested by statute or treaty; and he had already, on page 457, made it manifest that he did not intend to retract or to qualify his opinion in the *License Cases.*

An intention on the part of Congress that commerce shall be free from the operation of laws passed by a State in the exercise of its police power cannot be inferred from the mere fact of there being no national legislation upon the subject, unless in matters as to which the power of Congress is exclusive. Where the power of Congress is exclusive, the States have, of course, no power to legislate; and it may be said that Congress, by not legislating, manifests an intention that there should be no legislation on the subject. But in matters over which the power of Congress is paramount only, and not exclusive, the power of the States is not excluded until Congress has legislated; and no intention that the States should not exercise, or continue to exercise, their power over the subject can be inferred from the want of congressional legislation. *Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 702–704.

The true test for determining when the power of Congress to regulate commerce is, and when it is not, exclusive, was formulated and established in *Cooley* v. *Board of Wardens,* 12 How. 299, concerning the validity of a state law for the regulation of pilots and pilotage, in which Mr. Justice Curtis, in delivering judgment, said: " When the nature of a power like this is spoken of, when it is said that the nature of the power requires that it should be exercised exclusively by Congress, it must be intended to refer to the subjects of that power, and to say they are of such a nature as to require exclusive legislation by Congress. Now, the power to regulate commerce embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port; and some, like the subject now in question, as imperatively

demanding that diversity, which alone can meet the local necessities of navigation. Either absolutely to affirm, or deny, that the nature of this power requires exclusive legislation by Congress, is to lose sight of the nature of the subjects of this power, and to assert concerning all of them, what is really applicable but to a part. Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." He then stated that the act of Congress of August 7, 1789, c. 9, § 4, (1 Stat. 54) in regard to pilotage, manifested the understanding of Congress, at the outset of the government, that the nature of the subject was not such as to require its exclusive legislation, but was such that, until Congress should find it necessary to exercise its power, it should be left to the legislation of the States, because it was local and not national, and was likely to be best provided for, not by one system or plan of regulation, but by as many as the legislative discretion of the several States should deem applicable to the local peculiarities of the ports within their limits; and he added, in words which appear to us equally appropriate to the case now before the court : "The practice of the States, and of the national government, has been in conformity with this declaration, from the origin of the national government to this time; and the nature of the subject, when examined, is such as to leave no doubt of the superior fitness and propriety, not to say the absolute necessity, of different systems of regulation, drawn from local knowledge and experience, and conformed to local wants." "We are of opinion that this state law was enacted by virtue of a power residing in the State to legislate; that it is not in conflict with any law of Congress; that it does not interfere with any system which Congress has established by making regulations, or by intentionally leaving individuals to their own unrestricted action." 12 How. 319–321.

In *Gilman* v. *Philadelphia*, 3 Wall. 713, 730, this court, speaking by Mr. Justice Swayne, applying the same test, and relying on *Willson* v. *Blackbird Creek Marsh Co.* and *Cooley* v. *Board of Wardens*, above cited, upheld the validity of a stat-

ute of Pennsylvania authorizing the construction of a bridge across the Schuylkill River, so as to prevent the passage of vessels with masts; and, after stating the points adjudged in *Brown* v. *Maryland* and in the *Passenger Cases*, said: " But a State, in the exercise of its police power, may forbid spirit-uous liquor imported from abroad, or from another State, to be sold by retail, or to be sold at all, without a license; and it may visit the violation of the prohibition with such punish-ment as it may deem proper. *License Cases*, 5 How. 504."

By the same test, and upon the authority of *Willson* v. *Blackbird Creek Marsh Co.*, a statute of Wisconsin, authoriz-ing the erection of a dam across a navigable river, was held to be constitutional in *Pound* v. *Turck*, 95 U. S. 459, 463. To the like effect are *Willamette Bridge* v. *Hatch*, 125 U. S. 1, 8–12, and other cases there cited.

Upon like grounds, it was held, in *Mobile County* v. *Kim-ball*, 102 U. S. 691, that a statute of Alabama, authorizing the improvement of the harbor of Mobile, did not trench upon the commercial power of Congress; and the court, after point-ing out that some expressions of Chief Justice Marshall in *Gibbons* v. *Ogden* as to the exclusiveness of the power of Con-gress to regulate commerce were restricted by the facts of that case, and by the subsequent judgment in *Willson* v. *Blackbird Creek Marsh Co.*, said: " In the *License Cases*, which were before the court in 1847, there was great diversity of views in the opinions of the different judges upon the operation of the grant of the commercial power of Congress in the absence of Congressional legislation. Extreme doctrines upon both sides of the question were asserted by some of the judges; but the decision reached, so far as it can be viewed as determining any question of construction, was confirmatory of the doctrine that legislation of Congress is essential to prohibit the action of the States upon the subjects there considered." 102 U. S. 700, 701.

In *Woodruff* v. *Parham*, 8 Wall. 123, a state statute, im-posing a uniform tax on all sales by auction within it, was held constitutional, as applied to sales of goods the product of other States and sold in the original and unbroken packages.

In *Hinson* v. *Lott*, 8 Wall. 148, decided at the same time, it was adjudged that a state statute which prohibited any dealers, introducing any intoxicating liquors into the State, from offering them for sale, without first paying a tax of fifty cents a gallon, and imposed a like tax on liquors manufactured within the State, was valid, as applied to liquors brought from another State, and held and offered for sale in the same barrels or packages in which they were brought in; because, in the words of Mr. Justice Miller, who delivered the opinion of the court in both cases, it was not "an attempt to regulate commerce, but an appropriate and legitimate exercise of the taxing power of the State." 8 Wall. 153. These two cases we. cited by the court in *Low* v. *Austin*, 13 Wall. 29, 34, and in *Cook* v. *Pennsylvania*, 97 U. S. 566, 573, in which, in accord with the opinions in the *License Cases*, state taxation upon original cases of wines imported from a foreign country, and upon which duties had been paid under acts of Congress, was held to be invalid.

In *Welton* v. *Missouri*, 91 U. S. 275, the point decided was that a state statute, requiring the payment of a license tax from persons selling, by going from place to place within the State for the purpose, goods not the growth or manufacture of the State, and not from persons so selling goods which, were the growth or manufacture of the State, was unconstitutional and void, by reason of the discrimination; and in *Machine Co.* v. *Gage*, 100 U. S. 676, a state statute imposing a like tax, without discriminating as to the place of growth or produce of material or manufacture, was adjudged to be constitutional and valid, as applied to machines made in and brought from another State.

In *Brown* v. *Houston*, 114 U. S. 622, it was decided that coal, mined in Pennsylvania and brought in boats by river from Pittsburg to New Orleans, to be there sold by the boat-load on account of the Pennsylvania owner, and remaining afloat in its original condition and original packages, was subject, in common with all other property in the city, to taxation under the general tax laws of Louisiana; and the court referred to *Woodruff* v. *Parham*, above cited, as upholding the validity

of a "tax· laid on auction sales of all property indiscriminately," and "which had no relation to the movement of goods from one State to another." 114 U. S. 634.

In *Walling* v. *Michigan*, 116 U. S. 446, the statute of Michigan, which was held to be an unconstitutional restraint of interstate commerce, imposed a different tax upon persons engaged within the State in the business of selling or soliciting the sale of intoxicating liquors to be sent into the State, from that imposed upon persons selling or soliciting the sale of such liquors manufactured within the State; and the court declared that the statute would be perfectly justified as "an exercise by the legislature of Michigan of the police power of the State for the discouragement of the use of intoxicating liquors, and the preservation of the health and morals of the people," "if it did not discriminate against the citizens and products of other States in a matter of commerce between the States, and thus usurp one of the prerogatives of the national legislature." 116 U. S. 460.

In *Wabash, St. Louis & Pacific Railway* v. *Illinois*, 118 U. S. 557, the only point decided was that a State had no power to regulate the rates of freight of any part of continuous transportation upon railroads partly within the State and partly in other States. In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, a state law requiring the payment of a license tax by drummers and persons not having a regularly licensed house of business within the taxing district, offering for sale or selling any goods by sample, was decided to be unconstitutional as applied to persons offering to sell goods on behalf of merchants residing in other States, because, as the majority of the court held, its effect was "to tax the sale of such goods, or the offer to sell them, before they are brought into the State." 120 U. S. 497. Neither of those cases appears to us to tend to limit the police power of the State to protect the public health, the public morals and the public peace within its own borders.

As was said by this court in *Sherlock* v. *Alling*, 93 U. S. 99, 103, "In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life and safety of

their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it, without constituting a regulation of it, within the meaning of the Constitution." It was accordingly held in that case that an action against a carrier engaged in interstate commerce might be maintained under a state statute giving a civil remedy, unknown to the common law, for negligence causing death; and in subsequent cases that what a State might punish or afford redress for, it might seek by proper precautions to prevent; and consequently, that a state statute requiring, under a penalty, engineers of all railroad trains within the State to be examined and licensed by a state board, either as to their qualifications generally, or as to their capacity to distinguish between color signals, was not in its nature a regulation of commerce, but was a constitutional exercise of the power reserved to the States, and intended to secure the safety of persons and property within their territorial limits, and, so far as it affected interstate commerce, not in conflict with any express enactment of Congress upon the subject, nor contrary to any intention of Congress to be presumed from its silence. *Smith* v. *Alabama*, 124 U. S. 465; *Nashville, Chattanooga & St. Louis Railway* v. *Alabama*, 128 U. S. 96.

In *Railroad Co.* v. *Husen*, 95 U. S. 465, it was expressly conceded, in the opinion of the court delivered by Mr. Justice Strong, that a State, in the exercise of its police power, could "legislate to prevent the spread of crime, or pauperism, or disturbance of the peace," as well as "justify the exclusion of property, dangerous to the property of citizens of the State; for example, animals having contagious or infectious diseases." 95 U. S. 471. And the decision, by which the statute of Missouri, forbidding the introduction of any Texas, Mexican or Indian cattle into the State, was held to be an unconstitutional interference with interstate commerce, rested, as clearly appears in the opinion in that case, and has since been distinctly recognized by the court, upon the ground that the statute made no distinction, in the transportation forbidden, between cattle which might be diseased and those which were not. *Kimmish* v. *Ball*, 129 U. S. 217, 221.

The authority of the States, in the exercise of their police power, and for the protection of life and health, to pass laws affecting things which are lawful subjects·or instruments of commerce, and even while they are actually employed in commerce, has been expressly recognized by Congress in the acts regulating the transportation of nitro-glycerine, as well as in the acts for the observation and execution of the quarantine and health laws of the States. Rev. Stat. §§ 4278–4280; 4792–4796.

In *Morgan's Steamship Co.* v. *Louisiana Board of Health,* 118 U. S. 455, 465, the system of quarantine laws established by the State of Louisiana was held, in accordance with earlier opinions, to be a constitutional exercise of the police power; and it was said by the court: "Quarantine laws belong to that class of state legislation which, whether passed with intent to regulate commerce or not, must be admitted to have that effect, and which are valid until displaced or contravened by some legislation of Congress. The matter is one in which the rules that should govern it may in many respects be different in different localities, and for that reason be better understood and more wisely established by the local authorities. The practice which should control a quarantine station on the Mississippi River, a hundred miles from the sea, may be widely and wisely different from that which is best for the harbor of New York." It was added that in this respect the case fell within the principle of *Willson* v. *Blackbird Creek Marsh Co., Cooley* v. *Board of Wardens, Gilman* v. *Philadelphia, Pound* v. *Turck,* and other cases.

In *Mugler* v. *Kansas,* 123 U. S. 623, the court said: "In the *License Cases,* 5 How. 504, the question was, whether certain statutes of Massachusetts, Rhode Island and New Hampshire, relating to the sale of spirituous liquors, were repugnant to the Constitution of the United States. In determining that question, it became necessary to inquire whether there was any conflict between the exercise by Congress of its power to regulate commerce with foreign countries, or among the several States, and the exercise by a State of what are called police powers. Although the members of the court did

not fully agree as to the grounds upon which the decision should be placed, they were unanimous in holding that the statutes then under examination were not inconsistent with the Constitution of the United States, or with any act of Congress." 123 U. S. 657, 658.

In *Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465, the point, and the only point decided, was that a statute of Iowa, which forbade common carriers to bring intoxicating liquors into the State from any other State, without first obtaining a certificate from a county officer of Iowa, that the consignee was authorized by the laws of Iowa to sell such liquors, was an unconstitutional regulation of interstate commerce. While Mr. Justice Field in his separate opinion (p. 507) intimated, and three dissenting justices (pp. 514, 515) feared, that the decision was in effect inconsistent with the decision in the *License Cases*, Mr. Justice Matthews, who delivered the judgment of the majority of the court, not only cautiously avoided committing the court to any such conclusion, but took great pains to mark the essential difference between the two decisions. On the one hand, after making a careful analysis of the opinions in the *License Cases*, he said: " From this analysis it is apparent that the question presented in this case was not decided in the *License Cases*. The point in judgment in them was strictly confined to the right of the States to prohibit the sale of intoxicating liquor after it had been brought within their territorial limits. The right to bring it within the States was not questioned." On the other hand, in stating the reasons for holding the statute of Iowa, prohibiting the transportation of liquors from another State, not to be a legitimate exertion of the police power of the State of Iowa, he said : " It is not an exercise of the jurisdiction of the State over persons and property within its limits. On the contrary, it is an attempt to exert that jurisdiction over persons and property within the limits of other States. It seeks to prohibit and stop their passage and importation into its own limits, and is designed as a regulation for the conduct of commerce before the merchandise is brought to its border." " But the right to prohibit sales, so far as conceded

to the States, arises only after the act of transportation has terminated, because the sales which the State may forbid are of things within its jurisdiction. Its power over them does not begin to operate until they are brought within the territorial limits which circumscribe it." 125 U. S. 479, 498, 499.

In the opinion of the majority of the court in that case, it was noted that the omission of Congress to legislate might not so readily justify an inference of its intention to exclude state legislation in matters affecting interstate commerce, as in those affecting foreign commerce; Mr. Justice Matthews saying: "The organization of our state and federal system of government is such that the people of the several States can have no relations with foreign powers in respect to commerce or any other subject, except through the government of the United States and its laws and treaties. The same necessity perhaps does not exist equally in reference to commerce among the States. The power conferred upon Congress to regulate commerce among the States is indeed contained in the same clause of the Constitution which confers upon it power to regulate commerce with foreign nations. The grant is conceived in the same terms, and the two powers are undoubtedly of the same class and character and equally extensive. The actual exercise of its power over either subject is equally and necessarily exclusive of that of the States, and paramount over all the powers of the States; so that state legislation, however legitimate in its origin or object, when it conflicts with the positive legislation of Congress, or its intention reasonably implied from its silence, in respect to the subject of commerce of both kinds, must fail. And yet, in respect to commerce among the States, it may be, for the reason already assigned, that the same inference is not always to be drawn from the absence of congressional legislation as might be in the case of commerce with foreign nations. The question, therefore, may be still considered in each case as it arises, whether the fact that Congress has failed in the particular instance to provide by law a regulation of commerce among the States is conclusive of its intention that the subject shall be free from all positive regulation, or that, until it positively

interferes, such commerce may be left to be freely dealt with by the respective States." 125 U. S. 482, 483.

In *Kidd* v. *Pearson*, 128 U. S. 1, a statute of Iowa, prohibiting the manufacture or sale of intoxicating liquors, except for mechanical, medicinal, culinary and sacramental purposes only, and authorizing any building used for their unlawful manufacture to be abated as a nuisance, was unanimously held to be constitutional, as applied to a case in which the liquors were manufactured for exportation and were sold outside the State; and the court, in showing how impracticable it would be for Congress to regulate the manufacture of goods in one State to be sold in another, said: "The demands of such a supervision would require, not uniform legislation generally applicable throughout the United States, but a swarm of statutes only locally applicable and utterly inconsistent." "A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the States, and less likely to have been what the framers of the Constitution intended, it would be difficult to imagine." 128 U. S. 21, 22.

The language thus applied to congressional supervision of the manufacture within one State of intoxicating liquors intended to be sold in other States appears to us to apply with hardly less force to the regulation by Congress of the sale within one State of intoxicating liquors brought from another State. How far the protection of the public order, health and morals demands the restriction or prohibition of the sale of intoxicating liquors is a question peculiarly appertaining to the legislatures of the several States, and to be determined by them upon their own views of public policy, taking into consideration the needs, the education, the habits and the usages, of people of various races and origin, and living in regions far apart and widely differing in climate and in physical characteristics. The local option laws prevailing in many of the States indicate the judgment of as many legislatures, that the sale of intoxicating liquors does not admit of regulation by a uniform rule over so large an area as a single State, much less over the area of a continent. It is manifest that the regulation

of the sale, as of the manufacture, of such 'liquors manufactured in one State to be sold in another, is a subject which, far from requiring, hardly admits of a uniform system or plan throughout the United States. It is, in its very nature, not national, but local ; and must, in order to be either reasonable or effective, conform to the local policy and legislation concerning the sale, or the manufacture, of intoxicating liquors generally. Congress cannot regulate this subject under the police power, because that power has not been conceded to Congress, but remains in the several States; nor under the commercial power, without either prescribing a general rule unsuited to the nature and requirements of the subject, or else departing from that uniformity of regulation which, as declared by this court in *Kidd* v. *Pearson,* above cited, it was the object of the commercial clause of the Constitution to secure.

The above review of the judgments of this court since the decision in the *License Cases* appears to us to demonstrate that that decision, while often referred to, has never been overruled or its authority impugned.

It only remains to sum up the reasons which have satisfied us that the judgment of the Supreme Court of Iowa in the case at bar should be affirmed.

The protection of the safety, the health, the morals, the good order and the general welfare of the people is the chief end of government. *Salus populi suprema lex.* The police power is inherent in the States, reserved to them by the Constitution, and necessary to their existence as organized governments. The Constitution of the United States and the laws made in pursuance thereof being the supreme law of the land, all statutes of a State must, of course, give way, so far as they are repugnant to the national Constitution and laws. But an intention is not lightly to be imputed to the framers of the Constitution, or to the Congress of the United States, to subordinate the protection of the safety, health and morals of the people to the promotion of trade and commerce.

The police power extends to the control and regulation of things which, when used in a lawful and proper manner, are

subjects of property and of commerce, and yet may be used so as to be injurious or dangerous to the public safety, the public health or the public morals. Common experience has shown, that the general and unrestricted use of intoxicating liquors tends to produce idleness, disorder, disease, pauperism and crime.

The power of regulating or prohibiting the manufacture and sale of intoxicating liquors appropriately belongs, as a branch of the police power, to the legislatures of the several States, and can be judiciously and effectively exercised by them alone, according to their views of public policy and local needs; and cannot practically, if it can constitutionally, be wielded by Congress as part of a national and uniform system.

The statutes in question were enacted by the State of Iowa in the exercise of its undoubted power to protect its inhabitants against the evils, physical, moral and social, attending the free use of intoxicating liquors. They are not aimed at interstate commerce; they have no relation to the movement of goods from one State to another, but operate only on intoxicating liquors within the territorial limits of the State; they include all such liquors without discrimination, and do not even mention where they are made or whence they come. They affect commerce much more remotely and indirectly than laws of a State, (the validity of which is unquestioned,) authorizing the erection of bridges and dams across navigable waters within its limits, which wholly obstruct the course of commerce and navigation; or than quarantine laws, which operate directly upon all ships and merchandise coming into the ports of the State.

If the statutes of a State, restricting or prohibiting the sale of intoxicating liquors within its territory, are to be held inoperative and void as applied to liquors sent or brought from another State and sold by the importer in what are called original packages, the consequence must be that an inhabitant of any State may, under the pretext of interstate commerce, and without license or supervision of any public authority, carry or send into, and sell in, any or all of the other States of the Union intoxicating liquors of whatever descrip-

tion, in cases or kegs, or even in single bottles or flasks, despite any legislation of those States on the subject, and although his own State should be the only one which had not enacted similar laws. It would require positive and explicit legislation on the part of Congress, to convince us that it contemplated or intended such a result.

The decision in the *License Cases*, 5 How. 504, by which the court, maintaining these views, unanimously adjudged that a general statute of a State, prohibiting the sale of intoxicating liquors without license from municipal authorities, included liquors brought from another State and sold by the importer in the original barrel or package, should be upheld and followed; because it was made upon full argument and great consideration; because it established a wise and just rule, regarding a most delicate point in our complex system of government, a point, always difficult of definition and adjustment, the contact between the paramount commercial power granted to Congress and the inherent police power reserved to the States; because it is in accordance with the usage and practice which have prevailed during the century since the adoption of the Constitution; because it has been accepted and acted on for forty years by Congress, by the state legislatures, by the courts and by the people; and because to hold otherwise would add nothing to the dignity and supremacy of the powers of Congress, while it would cripple, not to say destroy, the whole control of every State over the sale of intoxicating liquors within its borders.

The silence and inaction of Congress upon the subject, during the long period since the decision in the *License Cases*, appear to us to require the inference that Congress intended that the law should remain as thereby declared by this court; rather than to warrant the presumption that Congress intended that commerce among the States should be free from the indirect effect of such an exercise of the police power for the public safety, as had been adjudged by that decision to be within the constitutional authority of the States.

For these reasons, we are compelled to dissent from the opinion and judgment of the majority of the court.