## AMERICAN EXPRESS CO. v. BEER.

[65 South. 575.]

1. STATUTES. *Construction. Validity. Commerce. Regulations. Powers of states. Shipment of liquors. Application of statutes. Power of congress.*

    It is always the court's duty in passing upon the constitutionality of a statute to separate the valid from the invalid parts thereof, if this can be done, and to permit the valid parts to stand unless the different parts of the statute are so intimately connected with and dependent upon each other as to warrant a belief that the legislature intended them as a whole and that if all could not be carried into effect it would not have enacted the residue independently.

2. COMMERCE. *Regulation. Power of state. Shipment of liquors. Validity and application of statutes.*

    Laws 1914, chapter 127, sections 2-7 and 11, paragraph 2, known as the May-Mott-Lewis Act making it unlawful for any person to order and have shipped to him, or for him to receive from without the state intoxicating liquors in excess of one gallon, does impose a direct burden on interstate commerce, but is authorized by the Webb-Kenyon Act. (Act March 1, 1913, chapter 90, 37 Stat. 699) divesting intoxicating liquors of its interstate character, when it is intended by any person interested therein to be received in violation of the laws of the state into which it is shipped, even as applied to liquor being shipped for personal use of the consignee and his family and not to be sold or used unlawfully.

3. COMMERCE. *Regulations. Shipment of liquors. Validity of statute.*

    The provisions in Laws 1914, chapter 127, section 5, known as the May-Mott-Laws Act, that those transporting liquors into the state shall keep a record of the same and file statements thereof with the clerk of the circuit court, is not invalid as imposing a direct burden on interstate commerce, regardless of whether or not it is within the Webb-Kenyon Act (Act March 1, 1913, chapter 90, 37 Stat. 699) which prohibits the transportation of liquor from one state into another for sale in violation of any law of the state where received.

4. COMMERCE. *Regulations. Power of congress. Shipment of liquors. Validity of statute.*

The power of congress to prescribe what commodities shall be legitimate subjects of interstate commerce is undoubted, and the Webb-Kenyon Act (March 1, 1913, chapter 90, 37 Stat. 699) is a proper exercise of such power.

5. COMMERCE. *Commerce clause. Operation.*

The commerce clause of the Federal Constitution excludes state regulation and control only over interstate commerce in articles that are legitimate subjects of trade and, in the absence of congressional legislation declares what are and what are not legitimate subjects of trade.

APPEAL from the chancery court of Warren county. HON. E. N. THOMAS, Chancellor.

Bill by M. D. Beer against the American Express Company. From a decree overruling a demurrer to the complaint, defendant appeals.

Sections 5 and 7 of the act of the Mississippi legislature of 1914 known as House Bill No. 5, are as follows:

Sec. 5. That it shall be the duty of any railroad company, express company, or any other common carrier, or person, firm or corporation who shall carry any intoxicating liquors into this state or from one point to another within this state, for the purpose of delivery, and who shall deliver such intoxicating liquor to any person, company or corporation, to keep a record of such liquor and file with the clerk of the circuit court of the county in which such liquor is delivered, . . . the name and post-office address of the consignor and consignee, the place of delivery, and to whom delivered, and the kind and amount of intoxicating liquor delivered, such statements to be filed within three days after the date of delivery of such liquor.

Sec. 7. That it shall be unlawful for any railroad company, express company, corporation or other common carrier or the agent of any railroad company, express company, corporation or other common carrier, to deliver any intoxicating liquor other than to the consignee;

107 Miss. 34

provided in any case where the consignee is unable, on account of sickness of himself or family, to appear in person and sign for such liquor, he may, by written authority, authorize some reputable person to sign and receive same for him; and in no case where there is reasonable ground for believing that any consignment or package contains intoxicating liquors, shall any railroad company, express company, corporation or other common carrier, or the agent of such railroad company, express company, corporation or common carrier, or person, deliver such consignment or package, without having such consignee or his lawful agent aforesaid sign and deliver to the person in whose charge such consignment or package may be for delivery, a written statement in substance as follows:

"I hereby certify that my name is ————; that my post office is ———— Mississippi; that I am more than twenty-one years of age; that I am the consignee to whom the package containing ———— of intoxicating liquors was consigned at ————, on the ———— day of ————, 19—, to be used for (set out the use for which they are to be used). I will not use this liquor in violation of any law of this state.

"Signed and dated at ————, Mississippi, this ———— day of ————, 19—.

"————————, Consignee,

"By ————————, Agent of Consignee."

And in no case shall any railroad company, express company, corporation or common carrier, or person or agent of such railroad company, express company, corporation or other common carrier or person, be liable for damages for not delivering such intoxicating liquor or package supposed to contain the same until such statement is executed and delivered, as herein provided. And in no case shall any such railroad company, express company, corporation, or other common carrier, person, or the agent of any such railroad company, express com-

pany, corporation or other common carrier or person, be held liable or subject to the penalties prescribed in this act for delivering such intoxicating liquors or package to the consignee without requiring such statement when such statement is executed and delivered as herein provided, unless the party taking such statement knows the same to be false, in which case he may refuse to deliver such intoxicating liquors or package.

### STATEMENT OF FACTS.

The bill filed in the court below alleged in substance, that appellee is lawfully engaged in the wholesale liquor business in the state of Louisiana, having numerous customers living at various points in the state of Mississippi; that appellant is a common carrier engaged in the business of transporting and delivering property from points without the state of Mississippi to points in the state, as well as from and to points wholly within the state; that shipments of liquor from appellee to customers in Mississippi originate in the state of Louisiana, and in the course of transportation are delivered by the initial carrier to appellant for transportation and delivery to the consignees in Mississippi. The bill further alleged that:

"The complainant on the 4th day of April, 1914, having received at his place of business at Delta, Louisiana, an order from W. J. Fletcher, who is over the age of twenty-one and purchaser in good faith who lives at Redwood, Mississippi, for one case of ——— whisky, containing twelve quarts, *i. e.,* three galons, to be shipped him at the said Redwood, Mississippi, said Redwood station being along the Yazoo & Mississippi Valley Railroad and a place where defendant has an office, whereupon the complainant acknowledging, responding, conforming to, and accepting said orders in good faith shipped through the Vicksburg & Delta Ferry Company, a common carrier engaged in interstate commerce between the state

of Louisiana and Mississippi, said case of whisky so or-
dered which was delivered to and accepted by the said
ferry company in a continuous transportation of inter-
state commerce to be delivered to W. J. Fletcher at Red-
wood, Mississippi, through said defendant express com-
pany at Vicksburg, Mississippi, and that on April 6, 1914,
within its usual office hours and according to its rules.
and regulations, said liquor was tendered the said de-
fendant express company to be transported and deliv-
ered to the said consignee at Redwood, Mississippi, as.
aforesaid.    That the defendant company through its
agents refused to accept the said package of liquor for
transportation and delivery as aforesaid, and gave as a
reason for said refusal that it was prohibited from trans-
porting liquor in one shipment when same amounted to
more than one gallon and for the further reason that, if
accepted and carried, said defendant could not make a
delivery of said shipment to the consignee, as it was pro-
hibited from carrying and delivering liquor in shipments.
of over one gallon by the laws of the state of Mississippi,.
under that certain act known as 'House Bill No. 5,' and
which was approved March 6, 1914, although said ship-
ment and package of liquor was known to the said de-
fendant to be a subject of interstate commerce, and in
continuous course of transportation at the time the liquor
was tendered to the said defendant, from Delta, Louis-
iana, to Redwood, Mississippi.    That the said defendant
agreed to accept the said liquor provided your complain-
ant would make three separate packages of not over
one gallon each and thereby make three separate and
distinct shipments to the said consignee, but that it could
not make delivery even of the three packages unless the
consignee would sign and execute as a condition prece-
dent to the delivery a certain receipt as designated and
provided for in the said 'House Bill No. 5' of Laws 1914.
That the said defendant then and there notified and ad-
vised the complainant and the ferry company that it.

would not thereafter receive, transport, or deliver any package containing malt, vinous, or spiritous liquor contained in packages of more than one gallon in one shipment, and that even if transported could not deliver a shipment of one gallon or less without requiring the consignee as a condition precedent to sign a receipt or written statement as provided for by the said act, 'House Bill No. 5' approved March 6, 1914, without regard to the fact that said shipment hereafter tendered or intended to be tendered to the said defendant was a subject of interstate commerce in due course of continuous transportation thereof or not. . . . That the consignee, W. J. Fletcher, to whom the case of whisky (so tendered to the defendant company), was sold, is one of your complainant's regular patrons, invariably purchasing in case lots. That said consignee is engaged in farming, and your complainant is informed and believes and states the fact to be that W. J. Fletcher is a man of high character and reputation, and he uses the liquor heretofore shipped for his own home consumption, and that the case of liquor so purchased by him from this complainant and refused by the defendant company was intended by said purchaser to be used, as complainant is informed and believes, and so states the fact to be, for his own home and members of his family and is not intended to be used by the said consignee, W. J. Fletcher, in violation of any law of the state of Mississippi, and of this fact your complainant so advised the said defendant express company, but notwithstanding same said defendant wholly refused to accept the said liquor for transportation and delivery as aforesaid."

The bill further alleged that:

"The sole reason why the defendant refused to receive the said case of whisky, and the sole reason why it will hereafter refuse to receive, carry, or deliver any liquor tendered by this complainant or the ferry company in due course of interstate trade and interstate

commerce is based upon the idea that defendant is bound to obey the provision and limitation of one gallon and the provision for delivery as provided by the law of 1914, as aforesaid or if it did, to suffer the penalties imposed and prescribed thereunder. . . . Your complainant will further show that the said defendant express company while engaged in interstate business as a common carrier for hire is not required to abide by, obey, nor to comply with the several provisions and sections of House Bill 5, Laws of 1914, approved March 6, 1914, aforesaid, and says that in so far as any provision in the act interferes with interstate commerce it is absolutely void and of no force.''

The bill then alleged that section 1, 2, 4, 5, 6, 7, 8, subsections 1, 2, 3, and 4, of section 11, sections 12, 13, 14, 16, 18, of House Bill No. 5, of the Laws of 1914, approved March 6, 1914, are void, because they transgress various provisions of the Federal Constitution.

The prayer of the bill was that:

Appellant be enjoined from ''refusing to accept, transport, and deliver along its said lines packages containing vinous, spirituous, alcoholic, malt, or other liquors which are subjects of interstate commerce of the general nature of those herein described which may be transported in continuous passage by complainant from the state of Louisiana to the city of Vicksburg, Mississippi, for continuous transportation in interstate commerce to places in the state of Mississippi reached by its said lines and where it has an office and agency, and that defendant be enjoined to accept such liquors when subjects of interstate commerce, and transport and deliver same upon complainant tendering such packages of liquors at its place of business in Vicksburg, Mississippi, for continuous shipment at reasonable hours and in accordance with such general rules and regulations as the defendant may from time to time have in force at Vicksburg, Mississippi, and other places on its line, with regard to the reception

and transportation and delivery of such subjects of commerce as it is customary to handle and without requiring a statement as provided in said act, but be handled under the laws enacted by the Congress of the United States of America, and to accept, transport and deliver to *bona fide* consignees over the age of twenty-one years, such subjects of interstate commerce as above described to points where it is doing business and has an office and agency and to transport the case of whisky, and said defendant be enjoined from filing with the circuit clerk the statement as required by sections 5 and 6 of said House Bill No. 5, and that it be enjoined from refusing to deliver said shipment, and also without requiring the consignee to sign a statement as provided by said Acts, 1914, to the town of Redwood, Mississippi, and that on final hearing said injunction be made perpetual, and that the defendant be made to accept, transport, and deliver at all times liquor shipments in accordance with the Constitution, laws, and statutes of the United States and the reasonable rules of the said defendant."

This bill was demurred to by appellant, the demurrer overruled, and, upon appellant's declining to plead further, a final decree was entered in accordance with the prayer of the bill.

*H. D. Minor, Chas. N. Burch, Hirsh, Dent & Landau, McLaurin & Armistead* and *Mayes & Mayes,* for appellant.

*Henry & Canizaro,* for appellee.

SMITH, J., delivered the opinion of the court.

(After stating the facts as above). While the constitutionality of practically all of the sections of the May-Mott-Lewis Act is called in question by counsel for appellee, we will take into consideration only the objections raised to sections 2, 5, 7, and paragraph 2 of section 11, and will leave the residue of the act altogether out of

view, for the reason that, if these sections are valid, whether the remaining sections are valid or not does not concern the parties hereto. It is always the court's duty in passing upon the constitutionality of a statute to separate the valid from the invalid parts thereof, if this can be done, and to permit the valid parts to stand unless the different parts of the statute are so intimately connected with and dependent upon each other as to warrant a belief that the legislature intended them as a whole and that if all could not be carried into effect it would not have enacted the residue independently. *Adams* v. *Standard Oil Co. of Kentucky*, 97 Miss. 879, 53 So. 692. We are relieved in the case at bar from any doubt as to whether the legislature would have enacted the sections of the statute here in question independently of the residue thereof, for the reason that it is expressly provided by section 18 of the act that:

"If, for any reason, any section or part of this act shall be held to be unconstitutional or invalid, then that fact shall not invalidate any other part of this act, but the same shall be enforced without reference to the part so held to be invalid."

The objections of counsel for appellant to the sections of the May-Mott-Lewis Act, to which we have indicated that we will address our attention, may be reduced in substance to three: First, the requirements and prohibitions therein contained impose a direct burden on interstate commerce; second, that the federal statute known as the Webb-Kenyon Act has no application for the reason that it appears that the liquor was not to be sold or used in violation of any law of the state; third, the Webb-Kenyon Act is void under the commerce clause of the Federal Constitution. Const. art. 1, sec. 8, subd. 3.

The first objection in so far as sections 2, 7, and 11 are concerned is well taken, for there can be no question but that the prohibitions and requirements contained in these three sections impose a direct burden on interstate

commerce in intoxicating liquors, and consequently are void unless within the provisions of the Webb-Kenyon Act. This act and its title are as follows:

"An act divesting intoxicating liquors of their interstate character in certain cases.

"Be it enacted, etc., that the shipment or transportation, in any manner or by any means whatsoever," of any "intoxicating liquor of any kind, from one state . . . . into any other state, . . . which said . . . intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package, or otherwise, in violation of any laws of such state, . . . is hereby prohibited."

Section No. 2 of the May-Mott-Lewis Act, following closely the provisions of the Webb-Kenyon Act, which the draftsman of these sections evidently had before him at the time they were drawn, provides:

"That it shall be unlawful for any person, firm or corporation, or any officer, agent or employee thereof, to ship or transport in any manner, or by any means whatever, any intoxicating liquor of any kind from a point within any other state, territory or district of the United States, or place subject to the jurisdiction thereof, to any person, firm or corporation, or any agent, officer or employee thereof, in this state, which said intoxicating liquor is intended by any person interested therein to be received, possessed, sold or in any manner used, either in the original package or otherwise, in violation of any law of this state now in force or hereafter to be enacted."

By paragraph 2 of section 11 of this act it is made lawful for—

"any person to order and have shipped and delivered to him, from without the state, for his own use or for social use in his home or for the use of the members of his family residing with him, such intoxicating liquors in quantities not exceeding one gallon, or malt liquor not exceeding one keg or cask of beer."

The result of these two sections of the act is that it is unlawful for any person to order and have shipped and delivered to him, or for him to receive, from without the state, intoxicating liquors in quantities in excess of one gallon. He has no right under the statute to receive intoxicating liquors shipped to him from a point without the state in quantities in excess of one gallon and should he do so such liquor would be received by him in violation of the laws of the state. Such a shipment of liquor therefore is clearly within the terms of the Webb-Kenyon Act as a mere inspection thereof will demonstrate, for it expressly devests intoxicating liquor of its interstate character when it is intended by any person interested therein to be received in violation of the laws of the state into which it is being transported.

But it is said, in substance, by counsel for appellee—and they are supported in so doing by the cases of *Adams Express Co.* v. *Commonwealth*, 154 Ky. 462, 157 S. W. 908, 48 L. R. A. (N. S.) 342, and *Palmer* v. *Southern Express Co* .(Tenn.), 165 S. W. 236—that the Webb-Kenyon Act has no reference to the quantity of liquor which a person interested therein may receive, or to the manner in which he may receive it, or with what he must do in order to be entitled to receive it; that the act applies only to intoxicating liquor intended by some person interested therein to be possessed, sold, or used in violation of law; that, quoting from their brief:

"It is enough for the disposition of this case to say, that it does not appear that the liquors shipped were intended to be sold or used in violation of any law of the state, and, therefore, the Webb-Kenyon Act does not apply to this controversy. From the facts stated and confessed by the demurrer, the liquors purchased were for personal use of W. J. Fletcher and his family; this was a lawful use, and indeed permitted by the statute in question."

The language of this act is plain and unambiguous, and it is therefore unnecessary to invoke any rules of con-

struction in order to ascertain its meaning. We will, however, examine it in the light of some of the leading cases decided by the supreme court of the United States in dealing with the right of a state to regulate commerce in intoxicating liquor shipped into the state from with-out.

This matter seems first to have been squarely presented to the court in 1847 in the License Cases, 5 How. 505, 12 L. Ed. 256. In those cases "the question was whether certain statutes of Massachusetts, Rhode Island, and New Hampshire relating to the sale of spirituous liquors were repugnant to the Constitution of the United States by reason of an alleged conflict between them and the power of Congress to regulate commerce with foreign countries and among the several states." The validity of the statutes was upheld, and all of the justices composing the court concurred in the result, but they each delivered separate opinions, except Mr. Justice NELSON, who concurred in the opinions delivered by Chief Justice and Mr. Justice CATRON. In 1887, in the case of *Bowman* v. *Chicago & N. W. Railroad Co.*, 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700, the court stated that:

"From a review of all of the opinions (referring to the opinions in the License Cases) the following conclusions are to be deduced as the result of the judgments in those cases: All the justices concurred in the proposition that the statutes in question were not made void by the mere existence of the power to regulate commerce with foreign nations and among the states delegated to Congress by the Constitution. They all concurred in the proposition that there was no legislation by Congress in pursuance of that power with which these statutes were in conflict. Some, including the Chief Justice, held that the matter of the importation and sale of articles of commerce was subject to the exclusive regulation of Congress whenever it chose to exert its power, and that

any statute of the state on the same subject in conflict
with such positive provisions of law enacted by Congress
would be void.  Others maintained the view that the
power of Congress to regulate commerce did not extend
to or include the subject of the sale of such articles of
commerce after they had been introduced into a state,
but that when the act of importation ended, by a delivery
to the consignee, the exclusive power over the subject
belonged to the states as a part of their police power.''

In *Bowman* v. *Chicago, etc., supra,* the court had under
consideration a statute of the state of Iowa forbidding
any common carrier to bring into the state any intoxicat-
ing liquor from any other state or territory without hav-
ing a certain certificate therein required, and, though
this statute was not in conflict with any regulation of in-
terstate commerce adopted by Congress, the court held
the act void for the reason that nonaction on the part of
Congress ''with respect to any particular commodity or
mode of transportation is a declaration of its purpose
that the commerce in the commodity or by that means
of transportation shall be free.''  In the course of its
opinion the court said:

''The subjects, indeed, upon which Congress can act
under this power are of infinite variety, requiring for
their successful management different plans or modes of
treatment.  Some of them are national in their charac-
ter, and admit and require uniformity of regulation, af-
fecting alike all the states; others are local, or are mere
aids to commerce, and can only be properly regulated by
provisions adapted to their special circumstances and lo-
calities.  Of the former class may be mentioned all that
portion of commerce with foreign countries or between
the states which consists in the transportation, purchase,
sale, and exchange of commodities.  Here there can of
necessity be only one system or plan of regulations, and
that Congress alone can prescribe.  Its nonaction in
such cases with respect to any particular commodity or

mode of transportation is a declaration of its purpose that the commerce in that commodity, or by that means of transportation, shall be free. . . .

"It is conceded, as we have already shown, that for the purposes of its policy, a state has legislative control, exclusive of Congress, within its territory, of all persons, things and transactions of strictly internal concern. For the purpose of protecting its people against the evils of intemperance it has the right to prohibit the manufacture within its limits of intoxicating liquors; it may also prohibit all domestic commerce in them between its own inhabitants, whether the articles are introduced from other states or from foreign countries; it may punish those who sell them in violation of its laws; it may adopt any measurers tending, even indirectly and remotely, to make the policy effective until it passes the line of power delegated to Congress under the Constitution. It cannot, without the consent of Congress, expressed or implied, regulate commerce between its people and those of other states of the Union in order to effect its end, however desirable such a regulation might be."

In this case the court in effect declined to follow the view concurred in by all of the justices in the License Cases, that state regulations of commerce in intoxicating liquor brought into the state from without, and while it retains its interstate character, are "not made void by the mere existence of the power to regulate commerce with foreign nations and among the states delegated to Congress by the Constitution," and for the first time clearly announced that the failure of Congress to legislate with respect thereto is a declaration of its purpose that commerce therein shall be free.

In 1890, the case of *Leisy* v. *Hardin*, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128, the court held that the right under the Constitution of a citizen of one state to import intoxicating liquor into another state carries with it the right to sell it there in the package in which it

was imported. In the course of its opinion the court also stated that:

"The authority of *Pierce* v. *New Hampshire* (one of the License Cases hereinbefore referred to), in so far as it rests on the view that the law of New Hampshire was valid because Congress had made no regulation on the subject, must be regarded as having been distinctly overthrown by the numerous cases hereinafter referred to."

Following these decisions Congress passed the law known as the Wilson Bill, which provided that:

"All fermented, distilled, or other intoxicating liquors or liquids transported into any state or territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." Act Aug 8, 1890, ch. 728, 26 Stat. 313 (U. S. Comp. St. 1901, p. 3177).

This statute was evidently passed as a result of the decision of *Bowman* v. *Chicago,* and *Leisy* v. *Hardin, supra,* and for the purpose of giving to the states the right it was at one time supposed they had, in the absence of congressional action, to regulate commerce in intoxicating liquors when brought into the state from without.

In *Rhodes* v. *State of Iowa,* 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088, the court held that the words "upon arrival in such state or territory," in the act, meant "arrival at the point of destination and delivery there to the consignee," so that the only effect of the act was to permit the states to regulate commerce in intoxicating liquors brought into the state from without after de-

livery of the liquor to the consignee, and while it yet remains in the package in which it was transported. In the course of its opinion the court pointed out that:

"It is clearly contemplated that the word 'arrival' signified that the goods should actually come into the state since it is provided that 'all fermented, distilled and other intoxicating liquors or liquids transported into a state or territory,' and this is further accentuated by the other provision 'or remaining therein for use, consummation, sale or storage therein.'"

And, continuing, the court said:

"This language makes it impossible in reason to hold that the law intended that the word 'arrival' should mean at the state line, since it presupposes the coming of the goods into the state for 'use, consumption, sale, or storage.' The fair inference from the enumeration of these conditions, which are all-embracing, is that the time when they could arise was made the test by which to determine the period when the operation of the state law should attach to goods brought into the state. But to uphold the meaning of the word 'arrival,' which is necessary to support the state law, as construed below, forces the conclusion that the act of Congress in question authorized the state laws to forbid the bringing into the state at all. This follows from the fact that if 'arrival' means crossing the line, then the act of crossing into the state would be a violation of the state law, and hence necessarily the operation of the law is to forbid crossing the line and to compel remaining beyond the same. . . . Undoubtedly the purpose of the act was to enable the law of the several states to control the character of the merchandise therein enumerated at an earlier date than would have otherwise been the case, but it is equally unquestionable that the act of Congress manifests no purpose to confer upon the states the power to give their statutes an extraterritorial operation so as to subject persons and property beyond their borders to the

restraints of their laws. . . . If it had been the intention of the act of Congress to provide for the stoppage at the state line of every interstate commerce cotract relating to the merchandise enumerated in the act, such purpose would have been easy of expression. The fact that such power was not conveyed, and that, on the contrary, the language of the statute relates to the receipt of the goods 'into any state or territory for use, consumption, sale, or storage therein,' negatives the correctness of the interpretation holding that the receipt into any state or territory for the purposes named could never take place.''

The next statute of this character enacted by Congress was the one here under consideration, the Webb-Kenyon Act, and a comparison of its language with that of the Wilson Act will demonstrate that its draftsman intended to cure the defect in the Wilson Act and to make it unlawful to transport into a state from without intoxicating liquors intended by any person interested therein to be dealt with contrary to the laws of the state; in other words, to devest such intoxicating liquor altogether of its interstate character, and thereby permit the laws of the state into which it was being transported to operate upon it immediately upon its crossing the state line—from which it follows that the state may prescribe not only the use to which liquor is to be put, but the quantity that, and the manner in which it, may be received.

As was said by the supreme court of Kentucky in the case of *Adams Express Co.* v. *Commonwealth*, 154 Ky. 462, 157 S. W. 908:

''The history of the Webb-Kenyon law, the causes that led to its enactment, and the evils it was intended to remedy, taken in connection with the carefully chosen words of the act, show that the object was to aid the states in suppressing the illegal traffic in intoxicating liquors that they had been much hindered in doing by the

protection afforded violators of the law by the commerce clause of the Federal Constitution.''

This manifest purpose for which the act was passed will fail of accomplishment if it applies only when the liquor which is being transported is intended by some person interested therein to be sold or used unlawfully, for the reason that it would be practically impossible in most cases to prove such an intent except by proving that it was, after being received, in fact sold, or used unlawfully. To give only such effect to the act as is here contended for by counsel for appellee would result in its being amended by judicial construction. As enacted by Congress, it reads as follows:

''Which intoxicating liquor is intended by any person interested therein to be received, possessed, sold, or in any manner used . . . in violation of the laws of such state,'' etc.

If construed as counsel contend it should be, it would in effect be amended either by striking out the word ''received,'' or by interpolating between the words ''received'' and ''possessed'' the words ''for the purpose of being,'' so that the act would then read:

''Which intoxicating liquor is intended by any person interested therein to be possessed, sold, or in any manner used in violation of any laws of such state,'' etc.

Or:

''Which intoxicating liquor is intended by any person interested therein to be received for the purpose of being possessed, sold, or in any manner used . . . in violation of any laws of such state,'' etc.

To so amend the act is the province of Congress and not of the courts.

The purchaser and consignee of the particular shipment here in question is, of course, one of the persons interested therein, and, since it exceeded one gallon in quantity, he manifesly intended to receive it in violation of law. Therefore, under the Webb-Kenyon Act sup-

plemented by the May-Mott-Lewis Act, it was unlawful
for appellant to transport it.

The construction placed upon the Webb-Kenyon Act
in *Atkinson* v. *Southern Express Co.,* 94 S. C. 444, 78
S. E. 516, 48 L. R. A. (N. S.) 349, though probably not
necessarily involved in the decision, seems to be in ac-
cordance with the views herein expressed.

With reference to the requirements of section 7 of our
state statute here under consideration, it will be sufficient
to say that they are only such as must be complied with
by the consignee before it becomes lawful for him to re-
ceive the liquor, and therefore clearly within the provi-
sions of the Webb-Kenyon Act.

It may be that the requirement of section 5 is not
within the provisions of the Webb-Kenyon Act, for the
reason that it applies to all shipments of intoxicating
liquor whether made in violation of law or not, as to
which we will express no opinion, for the reason we think
the views expressed by the supreme court of Tennessee
in the case of *Palmer* v. *Southern Express Co.,* 165 S. W.
244, in paragraphs 7 and 8 of its opinion, are sound, and
that therefore this requirement is valid.

This brings us to the question whether Congress ex-
ceeded its power in enacting the Webb-Kenyon Act.

"The power vested in Congress to 'regulate commerce
with foreign nations, and among the several states, and
with the Indian Tribes,' is the power to prescribe the
rule by which that commerce is to be governed, and is a
power complete in itself, acknowledging no limitations
other than those prescribed in the Constitution. It is
coextensive with the subject on which it acts and cannot
be stopped at the external boundary of a state, but must
enter its enterior and must be capable of authorizing the
disposition of those articles which it introduces, so that
they may become mingled with the common mass of
property within the territory entered. *Gibbons* v. *Og-
den,* 22 U. S. (9 Wheat.) 1, 6 L. Ed. 23; *Brown* v. *Mary-*

*land,* 25 U. S. (12 Wheat.) 419, 6 L. Ed. 678." *Leisy* v. *Hardin,* 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128.

"The power to regulate commerce includes the power to declare what property or things may be the subject of commerce, and therefore Congress has power to prescribe what articles of merchandise shall not be the subject of interstate or foreign commerce." License Cases, 46 U. S. (5 How.) 504, 12 L. Ed. 256; *Bowman* v. *Chicago, etc.,* 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; *Leisy* v. *Hardin,* 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 135; *United States* v. *Gould,* 25 Fed. Cas. No. 15,239; *United States* v. *The William,* Fed. Cas. No. 16,700; *Charge to Grand Jury,* Fed. Cas. No. 18,269a.

This power to exclude any commodity from interstate commerce is as broad as the power to regulate from which it is derived—is therefore "complete in itself, acknowledging no limitations other than those prescribed in the Constitution." No limitation upon this power is contained in the commerce clause, and no such limitation contained in any other section of the Constitution has been called to our attention. In the License Cases, *supra,* Chief Justice TANEY expressly stated that:

"Congress, under its general power to regulate commerce with foreign nations, may prescribe what articles of merchandise shall be admitted, and what excluded; and may therefore admit or not, as it shall deem best, the importation of ardent spirits."

While the authority of the License Cases has been weakened and on some points entirely overthrown by a number of later cases of which *Bowman* v. *Chicago, etc., supra,* and *Leisy* v. *Hardin, supra,* are a type, in none of them was this statement of Congress' power by Chief Justice TANEY challenged, and in all of them the power of Congress to prescribe what commodities shall be legitimate subjects of interstate commerce was expressly conceded. A power to wholly exclude a commodity from interstate commerce necessarily embraces within it the

power to exclude it partially or when certain conditions exist. *Wilkerson* v. *Rahrer,* 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572. Therefore it seems clear that Congress was well within its power in declaring that it should be unlawful to transport into a state intoxicating liquor that "is intended by any person interested therein to be received, possessed, sold, or in any manner used . . . in violation of any laws of such state."

The commerce clause of the Constitution excludes state regulation and control only over interstate commerce in articles that are legitimate subjects of trade and, in the absence of congressional legislation declaring what are and what are not legitimate subjects of trade, the right of a state "to prohibit the importation and sale of articles inherently unworthy of commerce and unfit for the use of the people" is undoubted and has been more than once expressly held to exist by the supreme court of the United States. 17 A. & E. Enc. of L. 69 ; *Leisy* v. *Hardin, supra; Wilkerson* v. *Rahrer, supra; Austin* v. *State,* 101 Tenn. 564, 48 S. W. 305, 50 L. R. A. 478, 70 Am. St. Rep. 703. See, also, the numerous cases decided by the supreme court of the United States dealing with state quarantine and inspection laws.

When an article by common consent is admitted to be "inherently unworthy of commerce and unfit for the use of the people," or the reverse, no trouble arises in the absence of congressional legislation in determining whether or not commerce therein can be regulated or controlled by state laws. It is only when a reasonable difference of opinion can exist as to whether an article is inherently unworthy of commerce that difficulties in this connection arise; and with reference to such articles the legislature has power to determine whether or not they shall be subjects of intrastate commerce, and Congress undoubtedly has the power to determine whether or not they shall be proper subjects of interstate commerce. That intoxicating liquors belongs to this class

of commodities has been frequently decided by the supreme court of the United States, which has always upheld the power of the states to suppress altogether commerce therein which lies wholly within their borders. In *Mugler* v. *Kansas,* 123 U. S. 663, 8 Sup. Ct. 273, 31 L. Ed. 205, in upholding the power of the state of Kansas to prohibit the manufacture and sale of intoxicating liquor, the court used the following language:

"It is not necessary, for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime, which have their origin in the use or abuse of ardent spirits. . . . For we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to everyone, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil."

And again in *Crowley* v. *Christensen,* 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620:

"By the general concurrence of opinion of every civilized and Christian community, there are few sources of crime and misery to society equal to the dramshop, where intoxicating liquors in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying. The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. . . . There is no inherent right in a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of the state or of a citizen of the United States."

If it be true that misery, pauperism, and crime largely "have their origin in the use or abuse of ardent spirits, . . . that the public health, the public morals, and the

public safety may be endangered by the general use of intoxicating drinks, . . . that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil," and since "there is no inherent right in a citizen to sell intoxicating liquors," it not being "a privilege of a citizen of the state or of a citizen of the United States," it would seem that the power of Congress to declare that it is not a legitimate subject of interstate commerce is beyond question. It is true that, as stated in *L. & N. R. Co.* v. *Cook Brewing Co.*, 223 U. S. 70, 32 Sup. Ct. 189, 56 L. Ed. 355, "by a long line of decisions, beginning even prior to *Leisy* v. *Hardin,* . . .it has been indisputably determined that beer and other intoxicating liquors are a recognized and legitimate subject of interstate commerce;" but the court was there, as was the court in the long line of decisions referred to, dealing with intoxicating liquor as an article of commerce in the absence of any legislation on the subject by Congress. That both Congress and the state legislatures working together in "frank and candid co-operation for the general good" are without power to destroy commerce in an article of this character is unthinkable, and such a result could not have been intended by "The Fathers" in framing the Constitution. That Congress has power to so legislate as to permit a state's laws passed under its police power to regulate and control commerce in commodities shipped into the state from without, and before they would otherwise lose their interstate character, has never been seriously questioned, and whenever such legislation has been enacted it has always been upheld by the supreme court of the United States. In *Bowman* v. *Chicago, etc., supra,* it was said that a state "cannot without the consent of Congress, expressed or implied, regulate commerce between its people and those of the other states of the Union," and in *Leisy* v. *Hardin, supra,* that:

"While, by virtue of its jurisdiction over persons and property within its limits, a state may provide for the

security of the lives, limbs, health, and comfort of persons and the protection of property, so situated, yet a subject-matter which has been confided exclusively to Congress by the Constitution is not within the jurisdiction of the police power of the state, unless placed there by congressional action.''

Similar utterances appear in the opinions rendered in other cases decided by that court. In *Wilkerson* v. *Rahrer, supra,* in upholding the power of Congress to pass the Wilson Act, the court pointed out that by this act no power was delegated to the states, but that it simply removed an impediment to the enforcement of the state laws in respect to sales of intoxicating liquors while remaining in the packages in which they were imported; and the court further stated that:

''No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so.''

The only difficulty that arises in this connection is that in *Rhodes* v. *State of Iowa, supra,* the court, in holding that the Wilson Act did not permit the laws of a state to operate upon intoxicating liquor brought into the state from without until delivery thereof to the consignee, declined to express any opinion on Congress' power to permit such laws to operate thereon immediately after it had crossed the state line. This power of Congress, under the construction placed upon the act there under consideration, was not involved, and the court very properly reserved it for future determination; but nothing in the opinion rendered indicates that a distinction will be drawn in the power of Congress to permit state laws to attach to and control commodities brought into the state from without after delivery to the consignee, and its power to permit such laws to attach to and control such

commodities immediately upon their crossing the state line, and before its transportation and delivery has been completed.

In further support of the foregoing views, we refer to the masterly opinion of the court of general sessions of Delaware in *State* v. *Grier,* 88 Atl. 579.

The decree of the court below will be reversed, and decree entered here sustaining the demurrer, dissolving the injunction, and dismissing appellee's bill.

*Reversed.*